there was no breach of the statutory trust, the debt was discharged.

*In re Trimble, supra,* 1 Bankr.Ct.Dec. at 1277, slip op. at 2–3 (emphasis supplied). *Trimble* and this case are sufficiently analogous to one another as to make it impossible to distinguish the result in *Trimble* from the result to be reached in this case.

The Court has reviewed thoroughly the cases of *Selby v. Ford Motor Company,* 590 F.2d 642 (6th Cir. 1979), *Parker v. Klochko Equipment Rental Co., Inc.,* 590 F.2d 649 (6th Cir. 1979), and *In re D & B Electric, Inc.,* 4 B.R. 263 (W.D.Ky.1980). While it appears that *Selby,* as urged by appellant in this case, may offer a great deal of guidance on many of the other issues which arose in this case, the Court need not address these matters today. In view of this Court's holding that appellant's apparent failure to sustain its burden of proving all elements necessary for maintaining a successful Section 17(a)(4) action in this case resulted in Judge Nims's decision, the Court declines to offer an opinion as to Judge Nims's reading of *Selby.* Since this case is resolved on other grounds, the other issues which may have existed shall be left for another day. Accordingly, the July 24, 1980, opinion and order of the Honorable David E. Nims, Jr., United States Bankruptcy Judge, in this cause is hereby AFFIRMED.

Although I believe that the District Court opinion which I have quoted in full is an adequate disposition of this case, the majority's addition of footnote 7 requires me to add a few sentences as follows:

The concept of another chance which is fundamental to bankruptcy law was thought to be important enough by those who wrote the law of this land for it to be placed in the Constitution of the United States of America. In Article I the forefathers delegated to the Congress the right to enact laws governing bankruptcy. They said in Article I, Section 8 "The Congress shall have power ... to establish ... *uniform laws* on the subject of Bankruptcies throughout the United States." (Emphasis supplied).

Those laws provide an opportunity for any person to start afresh if he or she has not been guilty of intentional fraud or defalcation. 11 U.S.C. § 35(a) (Supp.1979) supplemented by the Revised Bankruptcy Act of 1979 11 U.S.C. § 523(a)(4) (1979). In my view no interpretation of state law can eliminate this federal barrier to Cashway's claim against Johnson.

This record simply does not present any proof of intentional fraud or defalcation nor does it indicate that any effort was ever made by Cashway to prove such.

Whether the reference to a concession on this score by Cashway was implied by the Bankruptcy Judge from plaintiff's failure to offer proofs on this issue or whether that failure was also supplemented by specific language uttered in chambers or at the bench but not recorded, does not seem to me to be critical. In any event, my colleagues have had to rely on exceedingly strained implication said to be devised from state law rather than on proofs of intentional fraud or defalcation which are required by federal bankruptcy law.

I would affirm.

Dwain LOVE, Individually and doing business as 43rd Parallel Publishing Company, Plaintiff-Appellant,

v.

The NEW YORK TIMES COMPANY, a foreign corporation, Defendant-Appellee.

No. 80–1766.

United States Court of Appeals, Sixth Circuit.

Argued April 12, 1982.

Decided Oct. 20, 1982.

Rehearing and Rehearing En Banc Denied Dec. 22, 1982.

Stephen A. Boone, Detroit, Mich., for plaintiff-appellant.

Philip A. Grashoff, Jr., Dahlberg, Mallender & Gawne, Detroit, Mich., for defendant-appellee.

Before EDWARDS, Chief Judge, MARTIN, Circuit Judge, and TUTTLE,* Senior Circuit Judge.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

In this case the parties agree on many of the related questions of fact and law. Understandably, however, they are far apart as to result. As we read appellant's brief, it appears designed to posture appellant as David confronting an aggressive Goliath (appellee New York Times Company)—and the District Judge as having stolen David's slingshot. To the contrary, appellee's brief, as we read it, pictures the appellant as an unsuccessful would-be publisher who, having failed to launch his magazine with any commercial success, is trying to recoup his losings from the deep pockets of an innocent publisher who had sought to follow the law and, in any event, had done appellant no harm.

Plaintiff-appellant Love sued the Defendant-appellee New York Times Company for trademark infringement and unfair competition. At trial Love made no contention that he had ever registered his trademark. Rather his reliance was upon "prior use and lack of abandonment" of the magazine title *US Quarterly* or *US*. It is plaintiff's contention that his first published *US Quarterly* magazine was damaged by the confusion created by the New York Times when it subsequently decided to launch *Us* magazine, a photo journal, designed (according to defendant) to compete with the magazine *People*. The New York Times claims, and its evidence at trial showed, that it conducted a title search without finding the existence of *US Quarterly*. It also appears to be clear, however, that the Times had actual notice from Love as early as February 1977 about Love's *US Quarterly* and his prior use

---

* Honorable Elbert P. Tuttle, Senior Circuit Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

of that name. Despite such notice, the New York Times continued publishing its magazine and proceeded to register its "US" trademark with the U.S. Patent and Trademark Office without notice of Love's claim. Its excuse for this conduct was that its investigation had showed that plaintiff had abandoned its trademark rights. It also claimed that its magazine was so different from that of plaintiff Love that there could be no "confusion" between the two.

The District Judge tried this case on jury waiver and wrote a careful opinion containing his findings of fact and conclusions of law. He resolved every disputed issue of fact in favor of plaintiff Love, except the last one. The District Court found that plaintiff Love had a protectible trademark right in "US" and that he was the first to use that mark in commerce for a magazine. He held the mark not to be generic or descriptive but "arbitrary." He also found that plaintiff had not abandoned his trademark. After all that, however, he phrased the ultimate test of infringement as "whether there is a likelihood of actual confusion or deception as to the source of origin of the goods." He answered that question in the negative and entered a finding of no cause for action.

█ We readily accept as not clearly erroneous all of the District Judge's findings of fact except that which deals with the issue of confusion. Even on that issue we find no fault with the following findings concerning confusion.

The District Judge emphasized differences in the two products:

Differences between the two magazines are apparent from the covers themselves. The title of plaintiff's magazine is located in the upper left hand cover of the magazine, similar to the location of the title of defendant's magazine. However, immediately above the title of plaintiff's magazine, in large capital letters, is printed "US QUARTERLY". Moreover, the phrase "Fashion for Men and Women" is printed immediately below the title of plaintiff's magazine. Defendant's magazine bears only the title "US" in the upper left hand cover. The publication date of defendant's magazine appears immediately below the title. Defendant's magazine cover always has a photograph of a 'celebrity' and a brief description of its feature articles is located on the left side. On the other hand, plaintiff briefly describes its feature articles or theme of the issue on the lower right hand corner of the cover. Defendant's magazine is published on a biweekly basis, whereas plaintiff's publication is intended to be published four times a year, though to date plaintiff has published only three issues in all. Moreover, a copy of defendant's magazine currently sells for $.75, whereas plaintiff's publication has sold anywhere from $1.50 to $2.00. (185a)

The District Judge also found basic differences in markets sought by the two publishers:

In addition, the magazines significantly differ in content. Defendant's magazine is a photo-journalistic magazine which deals in "soft" news and is aimed towards the general public. Its articles are concerned primarily with persons associated with the movie, television and music industries. On the other hand, plaintiff's magazine is primarily a fashion magazine which is aimed towards blacks and other minorities. Although plaintiff testified that his magazine is directed toward the general public and is designed to be mode than a fashion magazine, we find that statements within plaintiff's own magazine contradict plaintiff's testimony. The promotional issue described US Quarterly as "an entirely new concept in fashion magazines" and as "unique in that it will be a first in fashion magazines that will be geared toward minority men, women and children ..." PX 3 at 2. The April 1976 issue of plaintiff's magazine announced that "(i)t is the intention of the staff at US Quarterly to provide a more positive image of Blacks, and other minorities" and that (the staff has) chose fashion as a vehicle with which to accomplish this." PX 5 at 3. The April 1976 issue indicated as well that its purpose

was to correct the situation where "Blacks and other minorities are being constantly portrayed in negative, counter-productive roles that offer little, if any, redeeming factors with which they can identify."

The District Judge held:

Because of the differences in content, format and presentation, we do not believe that reasonably prudent consumers would be confused as to the source or origin of defendant's magazine.

The next to the last line of the District Judge's opinion also read: "There was no evidence that defendant was trading on plaintiff's name or reputation." Our review of this record shows that these last two findings are not "clearly erroneous."

After all of this has been said, however, there are still questions as to the confusion issue. Plaintiff was engaged in a genuine and professional attempt to launch his magazine. He claimed he was frustrated—at least in part—by the flooding of the national magazine market with thousands of copies every two weeks of a magazine published by defendant with similar format using the same or highly similar name. The major impact of defendant's magazine may well have been upon plaintiff's chances of getting financing and outlets. A careful financier would hardly loan money for continuing a magazine on the general market named "US" or "US Quarterly" when that same market had been flooded with copies of The New York Times Company's "US." Thus, theoretically plaintiff's proofs might be argued to establish "reverse confusion" by putting plaintiff Love in the position of appearing to be trading on the name chosen by the later or junior user.

Although we recognize the possibility that plaintiff might have been damaged by the aspect of "reverse confusion" referred to immediately above, our review of this record does not provide a basis for overturning the District Court's judgment. On the second day of trial, appellant waived both a jury trial and his prayer for relief in the form of damages. Further, the record does not disclose any proofs from which the

District Judge could have made an award of compensation related to the possible injury to which we have referred—except by sheerest speculation.

In short, it appears that appellant took an all or nothing gamble on his ability to persuade the District Court to award it the New York Times Company's (thus far wholly prospective) profits from its US magazine rather than attempt to prove its own damages. We find no way by which, on this record, the District Judge could have separated from the reverse confusion issue the financial impact of such factors as unsatisfactory sales of his first issue (which was published before defendant's magazine was on the market) and inadequate financing. The record shows that 50,000 copies of this issue were printed and only 5,000 were sold. This left plaintiff deeply in debt to his printer. Plainly plaintiff was staring financial disaster in the face when the defendant's decisions to publish its US magazine was made.

■ In addition, we agree with the District Judge's holding that injunctive relief would be inequitable in this case. The New York Times' investment in its magazine is by now over 7 million dollars, many times greater than that of plaintiff's investment or of his reasonable expectation of return from his magazine. As we have previously indicated, the record also supports the District Judge's finding that the New York Times never intended public deception or any "passing off" of its magazine as that of the plaintiff's.

This case is clearly different from most trademark infringement cases. First, as indicated above, it does not involve "palming off." The usual infringement case involves a junior user who is attempting to trade on the goodwill associated with the well-established senior user's product. There are numerous Sixth Circuit and Michigan cases that label "palming off" as the "essence of the wrong of trademark infringement." See Beer Nuts, Inc. v. King Nut Co., 477 F.2d 326 (6th Cir.), cert. denied, 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973);

*Hemmeter Cigar Co. v. Congress Cigar Co.,* 118 F.2d 64 (6th Cir. 1941); *Schwannecke v. Genessee Coal & Ice Co.,* 262 Mich. 624, 247 N.W. 761 (1933). In this case, the New York Times was not attempting to trade on any goodwill associated with plaintiff's magazine and therefore was not engaged in palming off.

The absence of "palming off," however, does not necessarily defeat plaintiff's claim, for this court has held that proof of "palming off" is not essential under Michigan law to a claim of unfair competition. "When indulged in, [palming off] is held to be the essence of the wrong" [citations omitted] [but] "it is not the sole method, certainly not the sole ground, for equitable intervention...." *Motor Improvements, Inc. v. A.C. Sparg Plug Co.,* 80 F.2d 385, 386 (6th Cir.), *cert. denied,* 298 U.S. 671, 56 S.Ct. 939, 80 L.Ed. 1394 (1936) *quoted in Clairol, Inc. v. Boston Discount Center of Berkley, Inc.,* 608 F.2d 1114 (6th Cir. 1979).

In his decision, the District Judge relied primarily upon Michigan law in this diversity case citing such cases as *Federal Engineering Co., Inc. v. Grieves,* 315 Mich. 326, 332, 24 N.W.2d 138 (1946); *Burns v. Schotz,* 343 Mich. 153, 156, 72 N.W.2d 149 (1955); *Schwannecke v. Genesee Coal & Ice Co.,* 262 Mich. 624, 627, 247 N.W. 761 (1933); *Boron Oil Co. v. Callanan,* 50 Mich.App. 580, 584–85, 213 N.W.2d 836 (1973).

He quoted the traditional unfair competition rule from the *Schwannecke* case as follows:

> Unfair competition ordinarily consists in the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares of one person for those of another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor. The rule is generally recognized that no one shall by imitation or unfair device induce the public to believe that the goods he offers for sale are the goods of another, and thereby appropriate to himself the value of the

reputation which the other has acquired for his own product or merchandise. 26 R.L.C. p. 875 *Schwannecke v. Genesee Coal & Ice Co.,* 262 Mich. 624, 627, 247 N.W. 761 (1933).

The District Judge, however, did not stop there. He also recognized a modern trend "not to require proof of actual competition in trademark infringement cases" citing *Boron Oil v. Callanan,* 50 Mich.App. 580, 584–85, 213 N.W.2d 836 (1973).

█ We, likewise, recognize a modern trend in trademark and unfair competition law to consider injury to a first or senior user even though the accused junior user has not intended to appropriate the business generated by the first user. In such unusual cases defendant's intent in adopting the mark is weighed in a balancing of the equities for injunctive relief. *See Vitarroz v. Borden, Inc.,* 644 F.2d 960 (2d Cir. 1981); *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979); *Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 272, 5 L.Ed.2d 244 (1960); *Mushroom Makers, Inc. v. R. G. Barry Corp.,* 580 F.2d 44 (2d Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Big O Tire Dealers v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365 (10th Cir. 1977), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978); *Squirtco v. Seven-Up Co.,* 628 F.2d 1086 (8th Cir. 1980); *Stuart v. Collins,* 489 F.Supp. 827 (S.D.N.Y.1980).

A balancing of the equities in this case supports the District Judge's decision. We have shown above that 1) defendant clearly was not seeking to "palm off" its goods as those of the plaintiff and in fact had not done so; 2) plaintiff dropped its claim for damages in favor of a demand for an accounting; and 3) plaintiff failed to present proofs that defendant's use of the name "US" had contributed in any ascertainable sum to plaintiff's previously existing financial troubles.

The judgment of the District Court is affirmed.