**BANDAG, INC.,**
Appellee/Cross-Appellant.

v.

**AL BOLSER'S TIRE STORES, INC.,**
Appellant/Cross-Appellee.

Appeal Nos. 83–1123, 83–1286.

United States Court of Appeals,
Federal Circuit.

Nov. 8, 1984.

George T. Mobille, Washington, D.C., argued for appellee/cross-appellant. With him on the brief was Robert W. Adams, Washington, D.C., Jeffrey R. Van Duzer, Seattle, Wash., of counsel.

Gary S. Kindness, Seattle, Wash., argued for appellant/cross-appellee Al Bolser. With him on the brief was James R. Uhlir, Seattle, Wash.

Before BENNETT, Circuit Judge, SKELTON, Senior Circuit Judge, and MILLER, Circuit Judge.

BENNETT, Circuit Judge.

## I. BACKGROUND

The matters here for consideration[1] encompass the separate appeals of both the plaintiff and defendant from the final judgment of the United States District Court for the Western District of Washington,[2] entered July 6, 1983,[3] in Civil Docket No. C82–124(v), an action for patent and trademark infringement and for unfair competition.

The defendant, Al Bolser Tire Stores, Inc. (Bolser), is a family-owned business begun in 1951 and engaged primarily in the retail and wholesale distribution of new and recapped tires in the State of Washington. Initially, Bolser recapped tires at its own recapping shop, using a hot recapping method.[4] This shop was closed in the mid-1960's, and thereafter Bolser met its needs for recaps through purchases from various outside recapping sources. It was the resumption of Bolser's own recapping activities in September 1981 using a cold process that appears to have figured most decisively in precipitating this lawsuit.

Bandag, Inc. (Bandag), organized in 1957, engages primarily in manufacturing precured tire tread rubber and other materials and equipment for retreading. It maintains a network of over 800 worldwide franchisees which are entitled to purchase such rubber, materials, and equipment and to use a "Bandag" cold-process retreading method, aspects of which have been covered at various times by Bandag patents. One of these is alleged to have been infringed by the cold process recapping of Bolser, which was carried out on equipment originally manufactured by Bandag and purchased by Bolser from a terminated local Bandag franchisee.

1. The discussion to follow can be summarized in outline form, which for the convenience of the reader is provided below.

    I.   BACKGROUND
    II.  TRADEMARK APPEAL
         A. Jurisdiction
         B. Choice of Law
         C. Trademark Liability
            1. Similarity
            2. Class of Goods and Services
            3. Marketing Channels
            4. Actual Confusion
            5. Intent of Alleged Infringer
         D. Trademark Remedies
            1. Injunction
            2. Monetary Recovery
               (a) Profits
               (b) Damages
               (c) Attorneys' Fees
    III. PATENT APPEAL
         A. Patent at Issue
         B. Equipment Purchased
         C. Patent Infringement Liability

2. The Hon. Donald S. Voorhees, District Judge.

3. The date of final judgment in this case was treated in the published order of this court appearing at 719 F.2d 392, 219 USPQ 1049 (Fed. Cir.1983).

4. In making recapped tires (recaps), the worn tread of a used tire is replaced on the casing thereof with new tread. In "hot" process retreading the rubber of the new tread is cured to achieve desired flexibility and other properties on location as it is being bonded to the old tire casing, a process requiring relatively high temperatures. By contrast, in "cold" process retreading, new tread composed of precured rubber when cut to size is able to be adhered to the casing at significantly lower temperatures.

In connection with its franchising and marketing, Bandag has obtained a number of United States trademark and service mark registrations. Bolser utilized at least one of these in the 1981–82 Seattle Yellow Pages telephone directory (telephone directory). Purportedly this was to advise the public of Bolser's capacity to provide Bandag recaps, which it then was regularly purchasing from authentic Bandag franchisees for resale. Bandag claims the telephone directory listing misrepresented Bolser as a Bandag franchisee. This is the basis for its charges of trademark infringement and unfair competition.

Bandag's complaint was filed on February 3, 1982, and tried without a jury for 4 days beginning February 28, 1983. The district judge ruled from the bench at the conclusion of trial that Bolser was guilty of trademark infringement but innocent of the charge of patent infringement. A memorandum of decision followed on March 15, 1983. The final judgment of the court awarded to Bandag damages of $36,212.38, attributable to Bolser's trademark infringement, and attorneys' fees of $13,604.25.

The decision of the district court as to trademark infringement and its issuance of an injunction related thereto are *affirmed.* Nevertheless, the award of damages and attorneys' fees based thereupon is *vacated.* The determination that no patent infringement has been shown is *reversed,* and this case is *remanded* for a determination of an appropriate monetary award to Bandag.

## II. TRADEMARK APPEAL

### A. *Jurisdiction*

Bandag has moved that Bolser's appeal of the trademark portion of this case (App. No. 83–1123), notice of which was filed after announcement of the decision below but before entry of the corresponding final judgment,[5] be transferred to the United States Court of Appeals for the Ninth Circuit, pursuant to 28 U.S.C. § 1631 (1982), in order to cure what is argued to be a lack of jurisdiction in this court to review the matter. The Bandag motion to transfer was originally filed when only Bolser's trademark appeal was yet pending, but before the end of the period for timely appeal by "any other party" provided by FED.R. APP.P. 4(a)(3). It was accordingly denied without prejudice as being premature. Subsequently, within the period for timely appeal, either by an initial appellant under FED.R.APP.P. 4(a)(1) or by "any other party" under FED.R.APP.P. 4(a)(3), Bandag filed notice of its separate appeal of the patent issues now before this court (App. No. 83–1286). Thereafter, Bandag renewed its earlier motion to transfer. Thus, this court must initially determine whether it has jurisdiction over an appeal of the final adjudication of a nonpatent claim in a case from which issues related to a patent claim are being separately appealed.

The complaint filed below by Bandag contained, *inter alia,* a count for patent infringement and another for trademark infringement. Jurisdiction of the district court over the subject matter of each was predicated, at least in part, on 28 U.S.C. § 1338(a) (1982).[6] Apparently no attempt was made, apart from the filing of various unsuccessful summary judgment motions, to effect either segregated presentation of evidence or the rendering of separate judgments on each count. Bandag argues that its post-judgment decision to seek review of the patent issues by separate appeal rather than by cross-appeal has significance to our treatment of the motion to transfer.

The jurisdiction of this court set forth in

---

**5.** FED.R.APP.P. 4(a)(2) provides that such a notice of appeal "shall be treated as filed after such entry [of judgment] and on the day thereof."

**6.** 28 U.S.C. § 1338(a):
"Patents, plant variety protection, copyrights, trademarks, and unfair competition

"(a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases."

28 U.S.C. § 1295(a)(1) (1982) [7] is exclusive as to "an appeal from a final decision of a district court of the United States ... if the jurisdiction of that court was based, in whole or in part, on section 1338 of this title." An exception to this exclusive jurisdiction is provided for in any "case involving a claim arising under any Act of Congress relating to copyrights or trademarks and no other claims under section 1338(a)."

Bandag reads this exception too narrowly when it argues that the issues in the trademark appeal "relate to trademarks and no other claims that arise under 28 U.S.C. § 1338(a), since the patent Appeal No. 83–1286 is totally separate therefrom." Although the patent and the trademark infringement claims presented for review involve the same parties, the acts alleged to have given rise to each do not overlap substantially. Thus, the patent and the trademark claims could have been resolved in separate trials with a minimal cost to judicial economy. In this instance, however, they were permissively joined when pled together in Bandag's original complaint without objection from Bolser. FED.R.CIV.P. 18(a).

■ That which triggers the exception of section 1295(a)(1) is not a claim, the issues of which can be fairly characterized as "relating to copyrights or trademarks and [relating to] no other claims under section 1338(a)," but rather the "case" which, while involving a claim "relating to copyrights or trademarks," involves in addition thereto "no other claims under section 1338(a)." The focus is not the interrelation of the issues involved in individual claims. The statute makes no mention of an exception to exclusive jurisdiction based on an issue analysis. If the exception of section 1295(a)(1) is applicable, it is as a result of an analysis of the jurisdictional basis of the appealed claims as each was correctly pled, accepted, and tried. The term "case" in this context refers collectively to the proceedings that transpired at the district court level when viewed pragmatically at the time of appeal.

■ Thus, the raising of patent issues in a separate appeal by Bandag, rather than in a cross-appeal, where those patent issues were tried below simultaneously with the trademark issues, has no impact on our disposition of the motion to transfer. No persuasive reason has been advanced in these circumstances for distinguishing between a cross-appeal and a separate appeal.[8] We explicitly reserve for future resolution the proper treatment to be accorded a similar motion to transfer in a case in which no appeal is brought of the patent issues tried before the district court.

■ Here there is no dispute that the trademark appeal of Bolser and the separate patent appeal by Bandag are both from "a final decision of a district court of the United States," or that the jurisdiction of that court was based, in whole or in part, on 28 U.S.C. § 1338. Thus, both appeals are within the exclusive jurisdiction of this court, unless the exception within section 1295(a)(1) applies.

In the proceedings below, both the trademark and patent counts, though conceivably capable of independent resolution, were pled together and tried in a single case

---

7. 28 U.S.C. § 1295(a)(1):
"Jurisdiction of the United States Court of Appeals for the Federal Circuit
"(a) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—
"(1) of an appeal from a final decision of a district court of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, if the jurisdiction of that court was based, in whole or in part, on section 1338 of this title, except that a case involving a claim arising under any Act of Congress relating to copyrights or trademarks and no other claims under section 1338(a) shall be governed by sections 1291, 1292, and 1294 of this title; . . . ."

8. Cf. *Jackson Jordon, Inc. v. Plasser American Corp.*, 725 F.2d 1373, 220 USPQ 945 (Fed.Cir. 1984) (order deeming both cross-appeals and separate appeals as appeals by "any other party [than appellant]" for purposes of determining timeliness under FED.R.APP.P. 4(a)(3)).

from which a single judgment ultimately issued. While that case did involve a claim under section 1338(a) that arose under the Acts of Congress relating to trademarks, it involved in addition another claim under section 1338(a) which has been appealed and which arose under Acts of Congress relating to patents. This precludes application of the exception to the exclusive jurisdiction of the Federal Circuit in section 1295(a)(1).

Bandag's motion to transfer the trademark appeal under 28 U.S. § 1631 is thus denied.

### B. *Choice of Law*

As to nonpatent matters, over which 28 U.S.C. § 1295(a)(1) does not afford this court exclusive subject matter jurisdiction, a significant choice of law question inherently arises. No mandate to unify intercircuit conflicts regarding these matters was given to this court by Congress in its passage of our enabling legislation, the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25.[9]

Accordingly, we deem it appropriate here to decide nonpatent matters in the light of the problems faced by the district court from which each count originated, including the law there applicable. In this manner, we desire to avoid exacerbating the problem of intercircuit conflicts in nonpatent areas. A district court judge should not be expected to look over his shoulder to the law in this circuit, save as to those claims over which our subject matter jurisdiction is exclusive.[10]

In the trademark portion of this case we will be guided by the relevant law in the Ninth Circuit, to the extent it can be discerned, and not require the district court here to follow conflicting rules, if any, arrived at in other circuits.

### C. *Trademark Liability*

The Bandag charge of trademark infringement arises from Bolser's unauthorized use of the Bandag logo in the following advertisement which appeared in the "Tire Dealers—Retail" section of the Seattle telephone directory between April 1981 and April 1982:

**9.** For the legislative history of Pub.L. No. 97–164, *see generally* S.REP. No. 97–275, 97th Cong., 2d Sess. 18–20, *reprinted in* 1982 U.S. CODE CONG. & AD.NEWS 11, 28–30.

**10.** Similarly, such a course was adopted in relation to appeals from district courts of the disqualification of attorneys, a purely procedural matter. *Panduit Corp. v. All States Plastic Mfg. Co.,* 744 F.2d 1564, 1572, 1575, 223 USPQ 465, 469–72 (Fed.Cir.1984) (per curiam); *In re Inter-*

*national Medical Prosthetics Research Assocs., Inc.,* 739 F.2d 618, 620–21 (Fed.Cir.1984). In relation to the correct choice of law pertinent to substantive matters *see American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1366–67, 220 USPQ 763, 775–76 (Fed.Cir.1984) (applying the law of the originating regional circuit regarding the necessity of showing relevant market to establish a section 2 Sherman Act violation).

The advertisement is alleged to have misrepresented to the public that Bolser was a Bandag franchisee or authorized representative, and thereby to have constituted false advertising. No other actions are contended to have contributed to the accused deception.

It is undisputed that since at least 1975 Bolser has resold, and continues to resell, tires which it has had recapped by authentic Bandag franchisees. Used tire casings for such recapping were either owned outright by Bolser or handled by Bolser on behalf of customers specifically seeking Bandag recapping of their own old casings. The propriety of these dealings has not been challenged.

An independent dealer may properly advertise that he sells merchandise associated by the public with a well-known trade or service mark so long as this does not mislead customers into thinking that he is an authorized agent of, or directly connected with, the owner of that mark. *See* J.T. McCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 25:11(A) at 261 (2d ed. 1984). In order to communicate accurate information about a product, a right is implied to use any mark fairly associated with that product.

As Justice Holmes clarified in *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924):

[W]hat new rights does the trade mark confer? It does not confer a right to prohibit the use of the word or words. It is not a copyright.... A trade mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his.... When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo. (Citations omitted.)

Although Bolser was entitled to make known that it sold Bandag recaps, the Bandag mark, particularly in logo form, was not public property. At the time of Bolser's alleged infringement, Bandag owned four registrations for various forms and applications of its mark,[11] the use of which by then had presumably become incontestable.[12] The goodwill inherent in the mark was the property of Bandag. If Bolser's use of the mark occurred in such a manner as to deceive the public, Bandag would be entitled to protection, *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352, 161 USPQ 769, 770 (9th Cir.1969), and possibly some form of damages. Although Bolser could advertise that it sold Bandag recaps, it was obliged not to do so in a manner which would have been likely to suggest to prospective customers that it was part of the Bandag organization of franchisees. *Id.* The problem was primarily one of designing clear, truthful advertising copy and using straightforward business practices.

Bandag charges that the layout of the advertisement in question involved unauthorized use of its logo which would falsely lead one to conclude that Bolser was one of its authorized representatives.

The district court agreed, finding that: [T]he use of the Bandag logo in the telephone directory in close conjunction with the word "CAPPING" and the phrase "SINCE 1951" clearly implied that defendant was itself engaged in the retreading of tires by the Bandag method and that this was a representation that defendant was using not only the Bandag method of retreading but was also using rubber supplied by Bandag and that it had been so engaged since 1951. Those representations were false and constituted an infringement of plaintiff's trademark.

The law of trademark and tradename infringement or unfair competition precludes one from using the distinctive mark or name of another if it will deceive or cause a likelihood of confusion as to the origin of the goods involved. *New West Corp. v. NYM Co.*, 595 F.2d 1194, 1201, 202 USPQ 643, 649 (9th Cir.1979). Liability under the Lanham Act, 15 U.S.C. §§ 1125(a), 1114(1) (1982), is premised on whether the public is likely to be deceived or confused by a given practice. Trademark infringement is one type of unfair competition, the gravamen of which is whether the defendant has created a "likelihood of confusion." *Shakey's Inc. v. Covalt*, 704 F.2d 426, 431, 218 USPQ 16, 19 (9th Cir.1983).

According to *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 347, 204 USPQ 808, 813 (9th Cir.1979), cases in the Ninth Circuit have been reconciled and the proper standard for review of a determination of likelihood of confusion delineated with clarity in *J.B. Williams Co. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187, 189 USPQ 10 (9th Cir.1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317, 188 USPQ 720 (1976), as being a "dichotomous test depending on whether the facts were disputed at trial." The court in *Williams*, 523 F.2d at 191, 189 USPQ at 13, asserted that the "results reached in different cases decided by this circuit only appear to be contradictory when the particular facts of each case are not analyzed [in relation to whether they were effectively disputed at trial]." It propounded the following standard:

---

**11.** *See* Appendix A for a synopsis of the federal trademark and service mark registrations to Bandag in evidence in this case.

**12.** See 15 U.S.C. § 1065 (1982).

Whether likelihood of confusion is more a question of law or one of fact depends on the circumstances of each particular case. To the extent that the conclusion of the trial court is based solely upon disputed findings of fact, the appellate court must follow the conclusion of the trial court unless it finds the underlying ... [findings] to be clearly erroneous. Thus, the Court has refused on many occasions to decide *de novo* the facts underlying the trial court's determination of whether likelihood of confusion existed.

. . . .

The standard followed in this Circuit in reviewing the trial court's decision regarding likelihood of confusion was set out in *HMH Publishing Co., Inc. v. Lambert*, 482 F.2d 595, 599, n. 6 (9th Cir. 1973):

"If the facts are not in dispute and the issue of confusing similarity is based solely upon the comparison of the marks in the context of extrinsic facts, the appellate court may determine the issue of confusing similarity."

To this standard, we add a corollary test, namely, where the conclusion of the trial court is based solely upon disputed findings of fact, the appellate court need not follow the conclusion of the trial court where it finds the underlying ... [findings] to be clearly erroneous.

523 F.2d at 190–91, 189 USPQ at 12–13 (footnotes omitted).

The foregoing was subsequently acknowledged and interpreted by a different panel of the circuit as a two-level test under which disputed foundational findings of facts are reviewed under the clearly erroneous standard and the legal conclusion based thereupon is reviewed de novo.

In assessing whether there is likelihood of confusion, a court first considers numerous factors and then, based thereon, determines whether there exists a likelihood of confusion. With the analysis so structured, the *J.B. Williams* and *AMF, Inc.* courts held that the determination of what is the state of affairs regarding each factor (a "foundational fact") is a finding of fact reviewed on the clearly erroneous standard, but the further determination of likelihood of confusion based on those factors is a legal conclusion. *See J.B. Williams*, 523 F.2d at 191–92; *AMF, Inc.*, 599 F.2d at 348–54 (applying two-level test as described here).

*Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 443–44, 205 USPQ 981, 984 (9th Cir.1980). *Accord Golden Door, Inc. v. Odisho*, 646 F.2d 347, 350, 208 USPQ 638, 641 (9th Cir.1980). Thus, in the present case, likelihood of confusion will be viewed as a legal conclusion made upon consideration of evidence pertinent to each of several foundational factors.

The foundational factors applicable to the instant case, involving practices characterizable as palming off, include the following:

1) the similarity between the practices at issue and those of authorized users;

2) the class of goods or services in question;

3) the marketing channels involved;

4) evidence of actual confusion; and

5) evidence of the intention of the defendant in engaging in the activity of which plaintiff complains.

*See J.B. Williams*, 523 F.2d at 191, 189 USPQ at 13.

Unfortunately, in the present case the district court failed to include discussion of, or to make any findings on, such foundational factors. The silence of the district court in not elaborating on any of them, even in light of its finding of infringement, cannot be interpreted as a finding in a specific sense on any of them. While generally inappropriate on appeal, it will be necessary to engage in an independent examination of the record and to address each contention of the parties on appeal. Nevertheless, we are aided by the fact that, despite an abundance of trial testimony, the evidence on the foundational factors is overwhelmingly undisputed. Thus, we find ourselves "in as good a position as

the trial judge" to evaluate the foundational factors and accordingly to determine the likelihood of confusion. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 152, 136 USPQ 508, 511 (9th Cir.1963).

It is only because of this unique circumstance that we do not remand for further fact-finding as to foundational factors.

1. *Similarity*

Bolser has used the identical mark registered to Bandag, complete even with the registration symbol. Thus, no issue is presented as to the similarity or lack thereof between marks.

Any question of similarity arises in relation to whether the practices of Bolser were so like those of a Bandag franchisee as to be likely to lead the public to believe that Bolser was a Bandag franchisee. The evidence relevant to that issue includes a consideration of how Bolser's activities compare with the practices of legitimate Bandag franchisees in representing their status as franchisees to the public, both within and beyond the telephone directory.

Bolser has entered into evidence page 1506 of the telephone directory, which included all listings under "Tire Retreading & Repairing." In contrast to the Bolser advertisement to which Bandag objects and which appeared on page 1502 under "Tire Dealers—Retail," the listing for Al Bolser Tire Stores in the "Tire Retreading & Repairing" section simply contained the address and phone number for three store locations and made no mention whatsoever of Bandag.

In the same section, under a listing entitled "Bandag Cold Process Retreading," appeared the Bandag logo above the words "Cold Process Retreading," some commercial puffing on behalf of Bandag, and the statement, "See your certified dealer." Below were the names, addresses and phone numbers for the two authorized Bandag dealers in the Seattle area (King County). The president of Phelps Tire Company (Phelps), one of those listed, testified that this advertisement had been placed by Bandag. Phelps had its own separate list-ing in the same section which did not include the Bandag logo. The only reference to the franchisor in Phelps' own listing was the statement, "Bandag custom retread-ers." The second Bandag franchisee, Brown H Tire & Retreading Company, had no second individual listing in the "Tire Retreading & Repairing" section.

Interestingly, in the "Tire Retreading & Repairing" section the listing for Sam's Tire Service referred the reader to its advertisement, an elaborate item, the largest on the page, containing an illustration. In the bottom portion of the dark broad frame of the advertisement appeared the logos of seven major tire suppliers, including Bandag. This Bandag logo included the federal registration symbol and was only slightly smaller than that appearing under the "Bandag Cold Processing Retreading" listing on the same page.

Bolser points out that its own advertisement made no explicit representations, such as "Certified Dealer" or "Bandag Custom Retreaders," utilized by actual Bandag franchisees in the "Tire Retreading & Repairing" section. While this is accurate, even accepting the motive stated by Bolser for having employed the Bandag logo, we do not view as clearly erroneous the evaluation of the district court that the layout of that logo "in close conjunction" with "CAPPING" and "SINCE 1951" tended to represent that Bolser was itself engaged in retreading by the Bandag method, and hence a Bandag franchisee.

Nevertheless, apart from the telephone directory, there is no evidence that Bolser made any uses of the Bandag mark which could be construed as representations that it was a Bandag franchisee. It did not employ the Bandag name in its signs or in its business cards, as might be done by a franchisee. According to a Bolser vice president, Tommy Bolser, he never told anyone he had a Bandag shop. According to another Bolser vice president, Jerry Bolser, the Bandag logos were even buffed off retreading equipment so that the plant would not be mistaken for "a Bandag

shop." As this testimony is uncontroverted, it can only be concluded that the Bandag theory of misrepresentation is grounded exclusively on the telephone directory advertisement which is in itself possibly a *de minimis* injury.

While no finding was made on the similarity of the overall practices of Bolser and legitimate Bandag franchisees, we do not consider that a finding one way or the other would significantly impact on our evaluation above of the finding of the district court that the Bolser telephone directory advertisement tended to represent, albeit not clearly in our opinion, that Bolser was a Bandag franchisee.

### 2. *Class of Goods and Services*

It is uncontested that by reselling Bandag recaps, Bolser was, to the limited extent of making this fact known, entitled to utilize the Bandag name. Bolser emphasizes that its use of the Bandag logo was restricted to the "Tire Dealers—Retail" section of the telephone directory and did not involve the "Tire Retreading & Repairing" section. According to Bolser, this would mean that one seeking to have tires recapped but unaware of sources for such services would, if searching properly, look in the "Tire Retreading & Repairing" section and not find any association between Bolser and Bandag. The relevance of this argument to a consideration of the class of goods and services is premised on the assumption that one finding the Bolser advertisement with Bandag logo in the "Tire Dealers—Retail" section would realize that the use of the Bandag logo by Bolser there only indicated the availability of Bandag recaps for sale. While this is not as meritless as Bandag contends, we have difficulty accepting that a user of the telephone directory, even a highly professional user, conducts searches and draws implications in such a strictly analytic manner.

### 3. *Marketing Channels*

The Bandag franchisees in Seattle and Bolser serve the same geographic market. The products and services of both overlap significantly. During at least a part of the time of its alleged trademark infringement Bolser actually did its own recapping.

Bolser asserts that its customers were sophisticated purchasers for large commercial and governmental concerns, and that such customers would be unlikely to have been confused by Bolser's use of the Bandag logo into thinking that Bolser was doing anything other than reselling tires retreaded by authorized Bandag franchisees. While it is clearly true that Bolser dealt with a number of large customers, and while the purchasing agents for such customers would in all likelihood have been more familiar with the structure of the local tire industry than individuals purchasing for personal use, there has been no showing that Bolser was patronized exclusively by large customers or even that these were incapable of being confused by Bolser's manner of use of the Bandag logo.

### 4. *Actual Confusion*

There is no dispute that the record lacks evidence of any instances of actual confusion of Bolser as a Bandag franchisee. Nevertheless, "this fact does not preclude this Court from concluding that there is a 'likelihood of confusion', as actual confusion is merely one factor to be considered by the Court when it makes its determination." *Williams*, 523 F.2d at 191 n. 5, 189 USPQ at 13 n. 5.

 Further, because evidence of actual confusion is difficult to produce and frequently discounted as unclear or insubstantial, *see, e.g., Alpha Industries*, 616 F.2d at 444–45, 205 USPQ at 985, "this factor is weighed heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *AMF Inc.*, 599 F.2d at 352–53, 204 USPQ at 818. *Accord Golden Door, Inc.*, 646 F.2d at 351, 208 USPQ at 642. No such circumstances are apparent here.

Therefore, Bandag's failure to show actual confusion in this instance is neither dispositive nor of great weight.

### 5. *Intent of Alleged Infringer*

When an alleged infringer knowingly adopts the mark of another, courts presume that it can accomplish its purpose of deceiving the public. *AMF Inc.*, 599 F.2d at 354, 204 USPQ at 819. *See Friend v. H.A. Friend & Co.*, 416 F.2d 526, 163 USPQ 159 (9th Cir.1969), *cert. denied*, 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94, 164 USPQ 481 (1970). Although the good faith of the infringer in adopting the infringing use is frequently interposed as a defense against this presumption, proof of actual intent to deceive is not required to sustain a conclusion of likelihood of confusion. *New West Corp.*, 595 F.2d at 1201, 202 USPQ at 649. Here it is very significant ultimately that while "[g]ood faith is less probative [than bad faith] of the likelihood of confusion, yet [it] may be given considerable weight in fashioning a remedy." *AMF Inc.*, 599 F.2d at 354, 204 USPQ at 819.

Bandag strains to impune Bolser's good faith in its use of the Bandag logo. Bandag suggests that Bolser's adoption of the logo and purchase of Bandag recapping equipment were part of a coordinated scheme, but the evidence does not support that theory.

Bolser on the other hand has made a fairly impressive showing of its good faith. Bolser has provided a very credible reason for its use of the logo: to advertise its resale of Bandag recaps. Bolser president, Alfred Bolser, explained that the layout of the advertisement was created by the telephone company on his request, but that he never saw an actual copy before it was published. He said that the words "since 1951" in the advertisement referred to the length of time that his business had been in operation. His explanation that the potentially misleading nature of the advertisement was merely the result of a chance conjunction of three elements of the advertisement in an unanticipated manner is entirely plausible.

The testimony of Alfred Bolser that Chris Brown of Brown H Tire & Retreading Company (Brown), a Bandag franchisee, originally suggested that Bolser use the Bandag logo is unrebutted. Brown's purpose in doing so was apparently to increase his own volume of business by increasing the number of Bandag recaps purchased from Brown by Bolser for resale. Bandag's argument in response, that no franchisee could sublicense use of the Bandag mark, is irrelevant to the matter of intent, unless Bandag can show that Bolser knew this fact at the time it decided to use the logo. Bandag has failed to do so.

Bolser's decision to place the advertisement was made in December 1980. Bandag's letter of March 6, 1981,[13] reached Bolser before the advertisement was published, but the meaning of the letter is ambiguous. It could be interpreted as an offer to franchise rather than a warning to desist. Premised in terms of a contemplated purchase of "used BANDAG equipment," it could have been viewed by Bolser as irrelevant, as such a transaction had already been consummated. The letter's vague reference to trademark integrity may understandably not have alerted Bolser to any problems with the use of the Bandag logo in the telephone directory, which Bolser had authorized 3 months earlier and which neither Bolser nor Bandag had yet seen.

On April 21, 1981, the Bandag district manager, Scott Campbell, visited Alfred Bolser to interest the latter in becoming a franchisee. Mr. Bolser then received for the first time a copy of a Bandag franchise

---

**13.** The full text of the letter follows with bracketed material added—

"It has come to my attention that you are considering buying some used BANDAG equipment from a former Bandag dealer.

"I thought it would be helpful for you to know that Bandag, Incorporated supports its franchisees by maintaining the integrity of our trademark and the products that it represents.

"For your information I am enclosing a copy of the Court decision in the *Bandag, Incorporated v. Lewis General Tires, Incorporated* [216 USPQ 81 (W.D.N.C.1981)] law suit which you may find of interest in understanding our patent and trademark protection."

agreement. Bandag argues unconvincingly that the portions of the sample agreement limiting a franchisee's right to sublicense the Bandag mark, should have put Mr. Bolser on notice that he could not use the logo in the telephone directory. This argument misses several points. First, Mr. Bolser was not interested in becoming a franchisee, so there would have been no reason to expect him to examine the agreement closely, much less to extrapolate the implication of one of its many clauses on his status as a nonfranchisee. Second, Mr. Bolser, as a reseller of Bandag recaps, had a bona fide reason and a right to use the logo apart from any franchise participation. Third, it is not clear from the record whether distribution of the telephone directory, which was in April 1981, occurred before or after the meeting with Mr. Campbell. It is clear, however, that no mention is made in the testimony of either party at the meeting concerning Bolser's advertising program, either planned or executed, or any Bandag objection thereto.

It is undisputed that Bolser, on December 1, 1981, voluntarily removed the Bandag logo from its advertisement in the forthcoming 1982–83 Seattle Yellow Pages telephone directory. This was one week before the mailing of the December 9, 1981 letter from Bandag's outside counsel clearly asserting for the first time that Bolser's advertisement constituted a trademark infringement. On this evidence the good faith of Bolser in its use of the Bandag logo appears unassailable.

■ In light of the examination above of the foundational factors upon which likelihood of confusion is determinable in this instance, we find no error in the legal conclusion of the district court that Bolser's advertising created the likelihood of confusing it as a Bandag franchisee. Thus, the liability of Bolser for trademark infringement and unfair advertising is affirmed.

### D.  TRADEMARK REMEDIES

1.  *Injunction*

Based on its conclusion of trademark infringement, the district court, pursuant to 15 U.S.C. § 1116 (1982), issued an injunction permanently enjoining Bolser from the following:

> [I]nfringement of plaintiff's registered trademark and service mark BANDAG by using the same in any advertisement by defendant of any tires or in connection with the sale by defendant of any tires other than in an advertisement for or in connection with the sale of tires by defendant which have been purchased from a Bandag franchisee and which bear the BANDAG mark.

■ This language is objected to by Bolser as overbroad in view of the district court finding that trademark infringement had resulted from "use of the Bandag logo in the telephone directory in close conjunction with the word 'CAPPING' and the phrase 'SINCE 1951.'" Bolser seems to argue that the district court should have so narrowed the injunction as merely to preclude Bolser from committing the acts of infringement for which it was found liable. This contention is without merit. The injunction meets the reasonable apprehension of Bandag that its mark might be employed unfairly by Bolser in marketing its own recaps. It is worded to permit Bolser exactly that use of the Bandag mark which it asserted it had originally intended, namely, to advise of its capacity to sell tires recapped by other tire dealers which were authentic Bandag franchisees.

Bolser contends that the injunction "appears to prohibit Bolser from doing clearly legal acts," such as advising customers that Bolser "utilizes chambers, rims, flanges and other retreading equipment originally manufactured by Bandag." Recalling Justice Holmes' comment that there is "no such sanctity in [a trademark] as to prevent its being used to tell the truth," *Prestonettes, Inc. v. Coty*, 264 U.S. at 368, 44 S.Ct. at 351, it should be obvious that the injunction does not prohibit Bolser from using the word "Bandag," referring to the source of its recapping equipment, in giving truthful information to its customers. "It is not taboo." *Id.*

As no credible objections have been raised to the injunction, its issuance below is affirmed.

### 2. *Monetary Recovery*

The monetary remedies for trademark right violation provided for in 15 U.S.C. § 1117 (1982) include the following:

(a) profits acquired by the defendant through its infringing use;

(b) damages sustained by the plaintiff trademark owner;

(c) costs of the action; and

(d) in "exceptional cases," reasonable attorneys' fees.

■ Section 1117 confers a great deal of discretion on a district court in fashioning a remedy for trademark infringement. *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121, 157 USPQ 76, 78 (9th Cir.1968), *cert. denied*, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879, 157 USPQ 720 (1968). *See Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275, 216 USPQ 1083, 1085 (9th Cir. 1982). The district court can increase the damages assessed up to three times those found as actual damages, and it may respond to a perceived inadequacy or excessiveness of profits by entering as a judgment such a sum as may be found to be just "according to the circumstances of the case." 15 U.S.C. § 1117. Nevertheless, any award in these two circumstances "shall constitute compensation and not a penalty," and all awards are expressly subjected to the "principles of equity." *Id.* Review of the trial court's exercise of its discretion is under the abuse of discretion standard, wherein the decision below is not to be disturbed, unless upon a weighing of relevant factors we are left with "a 'definite and firm conviction' that the court below committed a clear error of judg-

ment." *Playboy Enterprises, Inc.*, 692 F.2d at 1275, 216 USPQ at 1085.

The Ninth Circuit acknowledged that "[t]he equitable limitation upon the granting of monetary awards under the Lanham Act, 15 U.S.C. § 1117, would seem to make it clear that such a remedy should not be granted as a matter of right." *Maier Brewing Co.*, 390 F.2d at 120, 157 USPQ at 78. *See Sleeper Lounge Co. v. Bell Manufacturing Co.*, 253 F.2d 720, 723, 117 USPQ 117, 119 (9th Cir.1958).

*Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 130, 67 S.Ct. 1136, 1139, 91 L.Ed. 1386, 73 USPQ 133, 136 (1947),[14] confirmed that "the character of the conduct giving rise to the unfair competition is relevant to the remedy which should be afforded." This case has been cited frequently for the proposition that an injunction alone can, under appropriate circumstances, fully satisfy the equities of a given case, particularly in the absence of a showing of wrongful intent, *Maier Brewing Co.*, 390 F.2d at 124, 157 USPQ at 80; *National Van Lines v. Dean*, 237 F.2d 688, 694, 111 USPQ 165, 170 (9th Cir.1956); *Golden Door, Inc. v. Odisho*, 437 F.Supp. 956, 968, 196 USPQ 532, 543 (N.D.Cal.1977), *aff'd*, 646 F.2d 347, 208 USPQ 638 (9th Cir.1980), or upon an inconclusive showing that the actions complained of did in fact cause actual damage to the plaintiff. *Highway Cruisers of California, Inc. v. Security Industries, Inc.*, 374 F.2d 875, 876, 153 USPQ 94, 95 (9th Cir.1967).

The goal of section 1117 is to achieve equity between or among parties. As stated by the Ninth Circuit in relation to precisely the equity sought in the award of a trademark recovery, "[e]quity has many reeds. A characteristic of it is that one may not get all of the reeds. One may get

**14.** Although *Champion* arose and was decided on the basis of the Trade-Mark Act of 1905, predecessor to the currently applicable Lanham Trademark Act of 1946, the case remains a leading decision regarding the right to recovery under section 35 of the Lanham Act, 15 U.S.C. § 1117. "[T]he legislative history of Section 35 does not demonstrate an intention to alter the basic rules of recovery that existed under the

1905 Act. The principal changes effected by the Lanham Act in the rules of recovery were: first, to require that awards of increased damages be compensatory, not punitive, and, second, to allow the courts discretion to increase or decrease awards based on the infringer's profits." Koelemay, *Monetary Relief for Trademark Infringement Under the Lanham Act*, 72 TRADE–MARK REP. 458, 487 (1982).

just enough relief to stop the evil where it is apparent no great damage was done to the complainant." *Id.* Defendant may not retain the fruits, if any, of unauthorized trademark use or continue that use; plaintiff is not, on the other hand, entitled to a windfall.

It is essential in fashioning the remedy in this case to rely, not merely on the legal conclusion of liability, but also to consider the nature of the infringing actions, including the intent with which they were motivated and the actuality, if any, of their adverse effects upon the aggrieved party.

Relevant, for example, is the fact that the sole unfair practice of Bolser upon which liability is premised is the unauthorized use of the Bandag logo in a single annual edition of the Seattle telephone directory. As Bandag correctly points out, this "single" use should not be construed as being *de minimis*, because the edition of the telephone directory involved, once distributed, remained for a year in the possession of the public with a concomitant pervasive and prolonged potential to mislead. Nevertheless, telephone directory listings are but one form of publicity used by businesses. With other commonly used modes of promotion in mind, the effects of telephone listings may not be substantial.

Within the telephone directory Bolser included the Bandag logo in only one of its two separate listings. The misrepresentation in the listing objected to was neither blatant, explicit, nor even readily apparent. The potential for misrepresentation appears to have resulted from the layout of the listing by a third party.

The record evidences no intent on the part of Bolser to use the Bandag mark for any purpose except that of giving notice of its resale of tires recapped by local Bandag franchisees. There has been no substantiation of a connection between Bolser's use of the Bandag logo and its decision to resume its own recapping in September 1981 after more than 15 years of doing none. That its recapping occurred on used Bandag equipment appears to be irrelevant, as there is no evidence that Bolser applied the Bandag logo to its own recaps or otherwise attempted to palm them off as the products of a Bandag franchisee.

Bandag has failed to demonstrate that it suffered actual damages proximately caused by the infringement of Bolser. The president of Phelps Tire Company (Phelps), a Bandag franchisee, merely testified that General Tire Company of Tacoma, Treadwell Stores, Andy's Tire, and Becker Transfer, which had each previously done business with Phelps, were at the time of trial being serviced instead by Bolser. He did not indicate why these companies had ceased doing business with Phelps or whether this had occurred between April 1981 and April 1982. That testimony is, therefore, inconclusive as to whether the loss of customers to Bolser was related to Bolser's trademark infringement.

Bandag district manager Scott Campbell stated that he knew of three customers lost by Bandag franchisees because of Bolser's sale of tires made by the precured process. These were *King County Solid Waste*, Boeing, and the city of Seattle. He admitted, however, that King County Solid Waste had merely begun obtaining through resale from Bolser Bandag products originating with a Bandag franchisee different from the ones with which King County Solid Waste had previously been dealing directly. The reference to the loss of the Boeing account was stricken by the court when the witness indicated that his knowledge of the matter "[p]robably ... was just hearsay." Campbell related that at an unspecified time he examined retread tires in a warehouse storage area for the city of Seattle. Using U.S. Department of Transportation numbers on those tires, he determined that they had been retreaded by Bolser, rather than by the Bandag franchisees which had supplied the city previously. The conclusiveness of this evidence is undermined by the lack of specificity in the testimony as to the time of the visit to the warehouse.

The president of Phelps testified that sales to municipalities are conducted primarily through calls for bids, and thus give rise to a business relationship interrupted

from year to year as different tire suppliers succeed in the bidding process with a given municipal customer. He admitted that Phelps was an unsuccessful bidder for the Seattle contract, having lost out to Bolser. There is no evidence to show that this was because of unfair practices by Bolser. Were Bolser improperly representing its status in the bidding process, it would seem this could be proven from documents. Bandag has produced none.

■ While Bandag charges that Bolser succeeded with its telephone directory listing in misleading customers into choosing Bolser as a Bandag franchisee, the failure of Bandag to provide evidence of actual confusion undermines its contention that it suffered tangible, recoverable damages. Bandag simply argues that, based on evidence of actual direct competition between Bolser and Bandag franchisees, the use of the Bandag logo in the telephone directory would have inevitably damaged the Bandag franchise program. The district court made no finding of actual damage to Bandag. Given the nature of the trademark use that occurred and the lack of evidence of actual confusion or damage, we conclude that it could not properly have found any actual damages.

■ Nevertheless, an inability to show actual damages does not alone preclude a recovery under section 1117. The district court made a monetary award of $49,-816.63, consisting of attorneys' fees and a sum termed "damages" in the amount of $36,212.38. The latter was justified in a memorandum decision dated May 13, 1983, as follows:

> Because defendant falsely represented that it was a franchisee of plaintiff, the Court is of the opinion that the appropriate measure of damages would be to treat defendant as if it were in fact a franchisee of plaintiff and to award to plaintiff in damages the amount in dollars which defendant would have had to pay to plaintiff as a royalty and service fee had defendant been in fact a Bandag franchisee.

Such franchisees pay Bandag a fixed percentage of the Bandag selling price as applied against all rubber products purchased for retreading by the licensee from any source. As Bolser had begun cold process retreading before the end of the period of its trademark infringement, the district court conveniently applied the franchisee measure of royalties to the rubber products it used.

(a) *Profits.* The award did not include an accounting to deprive Bolser of profits made by exploiting the Bandag logo. Accordingly, Bandag argues its entitlement to $112,000 in profits purportedly made by Bolser on its retreading during the period of trademark infringement.

■ An accounting, however, is not automatic, *see Champion Spark Plug Co.,* 331 U.S. at 131, 67 S.Ct. at 1139, 73 USPQ at 136; *Highway Cruisers,* 374 F.2d at 876, 153 USPQ at 95, and may be denied at the discretion of the district court, *National Van Lines,* 237 F.2d at 694, 111 USPQ at 170, where there has been no showing of fraud and defendant's innocent use stands unrefuted, *cf. Golden Door, Inc.,* 437 F.Supp. at 968, 196 USPQ at 543, *aff'd,* 646 F.2d 347, 208 USPQ 638 (9th Cir.1980), or where as here "careful examination of the record fails to reveal any specific evidence to the effect that [plaintiff] has lost substantial business and profits as a result of [defendant's] unfair competition." *National Van Lines,* 237 F.2d at 694, 111 USPQ at 170 (where even actual confusion was in evidence).

■ We are left with no definite and firm conviction that the district court, in refusing to grant Bandag an accounting of Bolser's profits, committed any clear error of judgment. Its decision not to make a monetary award encompassing profits is affirmed.

(b) *Damages.* Relying on Fifth Circuit precedent, Bandag asserts that it is appropriate to measure the damages to be awarded for unauthorized trademark usage by reference to a royalty rate under which the trademark was otherwise licensed, *Holiday Inns, Inc. v. Airport Holiday*

*Corp.*, 493 F.Supp. 1025, 212 USPQ 208 (N.D.Tex.1980), *aff'd on other grounds*, 683 F.2d 931, 216 USPQ 568 (5th Cir.1982), or by reference to a royalty rate offered by a party, but rejected by the trademark owner prior to infringement by the party. *Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturing, Inc.*, 597 F.2d 71, 202 USPQ 536 (5th Cir. 1979).

The degree of influence these Fifth Circuit decisions will exercise over the Ninth Circuit is unclear. It is clear that 15 U.S.C. § 1117 requires that any monetary award granted under its authority be conditioned by equitable considerations and not be punitive. In the *Boston Professional Hockey Association* case, the defendant, seeking to manufacture embroidered embodiments of the team symbols of the members of the National Hockey League, offered plaintiff's exclusive licensing agent $25,000 for a 3-year exclusive, but only $15,000 for a 3-year nonexclusive, license. The offers were refused and infringement followed nonetheless. The district court stated that the defendant merely appropriated what it had been unable to obtain by bargaining and calculated an element of the damages portion of its monetary award based on the $25,000 offer. On appeal the Fifth Circuit approved the logic of this action but, noting that the existence of a prior licensee would have made it impossible for the defendant to have been granted an exclusive license, found that measure to have been clearly erroneous, 597 F.2d at 76, 202 USPQ at 539–40, and required use of the $15,000 offer corresponding to the 3-year nonexclusive license.

*Boston Professional Hockey Association* thus stands for the proposition that any royalty-based measure of damages must exhibit a strictly rational correlation between the rights appropriated and the measure of damages applied. It certainly did not "rule" in any unqualified sense that "royalties normally received for the use of

a mark are *the* proper measure of damages for misuse of those marks." *Holiday Inns*, 493 F.Supp. at 1028, 212 USPQ at 209 (emphasis added).[15] Royalties normally received for the use of a mark *may* be *a* proper measure, *if* that measure comports with the equitable limitations of section 1117 and bears a rational relationship to the rights appropriated.

■ Such a rational relationship is absent in the instant case. Bolser by its use of the Bandag logo in one of its telephone directory listings did not appropriate that which a full royalty secures for a Bandag franchisee. Such a franchisee is entitled to "use the 'Bandag' name and mark, including trademark, service mark and logos." Even this entitlement Bolser appropriated in only minor degree. Further, a franchisee is entitled to "make, use, and sell retreaded tires by the Bandag Method, together with all improvements thereof developed by BANDAG," as well as to be provided with materials and services relating to franchise management, including merchandising, auditing, advertising, public relations, personnel management, training, market research, sales development, and updated technical support. The award of a full franchisee royalty, premised on the coincidence of Bolser's resumption of recapping during the time its listing with the Bandag logo appeared in the telephone directory, is grossly out of proportion to that which was appropriated and works a penalty in violation of section 1117. The award is particularly onerous in that Bandag has failed to demonstrate any wrongful intent on the part of Bolser to usurp the good will inhering in the mark. The action of Bolser could at worst be characterized as deliberate, *see Highway Cruisers*, 374 F.2d at 876, 153 USPQ at 94, in that Bolser consciously decided to employ the Bandag logo, but thought it was entitled to do so. Nothing approaching the willfulness apparent in *Boston Professional Hockey Associ-*

---

**15.** *Holiday Inns,* in contrast to the present case, involved a terminated franchisee of plaintiff which after termination continued to infringe plaintiff's mark in a most willful fashion "until at least the date of trial." 493 F.Supp. at 1027, 212 USPQ at 208.

*ation* and *Holiday Inns, Inc.* exists in this case.

The inappropriateness of the award is underscored by the fact that Bandag has failed to show any actual injury to itself or to suggest the plausibility of such through the presentation of evidence of actual confusion of Bolser as a Bandag franchisee. Further, it is uncontroverted that the business practice at Bolser was to supply customers who requested Bandag recaps with tires obtained from Bandag franchisees, tires as to which Bandag had already made its profit. In the absence of a proof of any actual damages, injunctive relief satisfies the equities of this case. *See, e.g., Golden Door, Inc.,* 437 F.Supp. at 968, 196 USPQ at 543, *aff'd,* 646 F.2d 347, 208 USPQ 638 (9th Cir.1980); *Sleeper Lounge Co.,* 253 F.2d at 723, 117 USPQ at 119.

We are in accord with the warning expressed in *Maier Brewing Co.,* 390 F.2d at 121–23, 157 USPQ at 79–81, and echoed in *Playboy Enterprises, Inc.,* 692 F.2d at 1274–75, 216 USPQ at 1084–85, that both a trademark owner and the public may be slighted if courts provide no greater remedy for infringement than an injunction. That warning was made in relation to infringement which was willfully calculated to exploit the advantage in an established mark. No such intent is in evidence in this case, neither is any actual damage or confusion. The property rights of trademark owners and the interests of the public are advanced neither by withholding monetary relief when equity requires such, nor by the award of arbitrary monetary compensation where no actual damages have been shown and defendant's behavior evidences no wrongful intent.

Upon our weighing of the relevant factors, we are left with the definite and firm conviction that the district court committed a clear error of judgment in granting any measure of compensation for damages. The award of $36,212.38 in damages is vacated.

16. *See supra* note 4.

(c) *Attorneys' Fees.* The availability of attorneys' fees under 15 U.S.C. § 1117 is a result of a 1975 amendment to the Lanham Act permitting their recovery in "exceptional cases."

Prior to enactment of the amendment, courts could not award attorneys' fees in trademark or unfair competition cases. *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). In Senate Report No. 93–1400, 93rd Congress, Second Session (1974), *reprinted in* 1974 U.S.Code & Ad.News 7132, the Committee on the Judiciary stated that the remedy of attorneys' fees "should be available in exceptional cases, *i.e.,* in infringement cases where the acts of infringement can be characterized as 'malicious', 'fraudulent', 'deliberate', or 'willful'." *Id.* at 7133. *Playboy Enterprises, Inc.,* 692 F.2d at 1276, 216 USPQ at 1086. In *Playboy Enterprises, Inc.,* the failure to award attorneys' fees was deemed to have been an abuse of discretion where the defendant "deliberately arranged to obtain counterfeit goods and to sell such goods as genuine PEI products." The court commented that, "the 1975 amendment to the Lanham Act was specifically directed towards eliminating such blatant activity." *Id.*

██ In support of its award of attorneys' fees in the present instance, the district court found this to be an "exceptional case" without stating the basis therefor. Such a practice frustrates appellate review, unless bad faith or deliberate and willful infringement is blatant, which is not the situation before us. Being unable to find in the record evidence of the factors delineated by Congress as justifying the classification of a case as "exceptional," we conclude that the award of attorneys' fees in relation to trademark infringement by Bolser was an abuse of discretion. That award is accordingly vacated.

### III. PATENT APPEAL

#### A. *The Patent at Issue*

The cold process recapping [16] conducted by Bolser since September 1981 is alleged

by Bandag to have infringed Claims 1–7 of its now expired United States Patent No. 3,236,709 which issued to Carver (the Carver patent) on February 22, 1966. The patent is entitled "Tire Recapping Process," and the process disclosed in its specification is said to overcome two causes of weak bonding between a new tread and an old casing in prior art cold process retreading methods, namely, "deformation and shrinkage of the tire casing due to the application of pressure thereto during the bonding operation, and ... the entrapment of air between the tread strip and the tire casing."

In the Carver method an adhesive is placed on the outer surface of the tire casing, which is then wrapped with a single layer of fresh precured tread rubber. This assembly is mounted on a tire rim and enclosed in a flexible cover which extends over the sidewalls or shoulders of the casing into a sealing engagement between the casing and shoulder-engaging flanges on each periphery of the rim. The space between the cover and tire, which contains the new tread and adhesive, is vented to the atmosphere. The rim-mounted tire is inflated to a pressure greater than the atmosphere, while a lesser pressure also in excess of the atmosphere is applied to the outside of the flexible cover. The difference in pressure between the atmosphere and that outside the flexible cover presses the new tread against the casing in a uniform manner expelling air trapped in the adhesive. The pressure within the tire assures that the casing will not be deformed.

Each of the claims asserted by Bandag is directed to a "method of retreading the road engaging surface of a tire." Independent Claims 1 and 4 consist exclusively of recitations of method steps.[17] The balance of the claims at issue are dependent, reciting variously the use of heat, the temperature range therefor, and the optimum pressure differential to maintain during curing.

As it is the claims of a patent which are the sole measure of the patent grant, *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339, 81 S.Ct. 599, 600, 5 L.Ed.2d 592, 128 USPQ 354, 356–57 (1961), the protected invention of the Carver patent is, as a matter of law, a method. *See Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569, 219 USPQ 1137, 1140 (Fed.Cir.1983). The patent does not, as "found" by the district court, combine "the features of both a process and an apparatus patent." The Carver patent is not directed to any article, device, product, or equipment, even equipment for performing the claimed method.

It is commonplace that the claims defining some inventions can by competent draftsmanship be directed to either a method or an apparatus. *See In re Johnston*, 502 F.2d 765, 772, 183 USPQ 172, 179 (CCPA 1974) (Rich, J., dissenting). The inventor of such an invention has the option as to the form the claims in his patent will assume. There is nothing improper in this state of affairs, however, and the exercise of that option is to be respected in interpreting such claims as do ultimately issue from prosecution. Thus, the Carver patent is not a patent on equipment for performing the method disclosed, even if its claims could have been so drafted.

The district court specifically found that the Carver patent was valid and enforceable and that Bolser's retreading activities would have infringed it. Nevertheless, Bolser was held to have not infringed, because the sequence of events by which it had obtained the equipment utilized in its cold process recapping was considered by the district court to have conferred on Bolser an implied license to use that equipment in the patented process of the Carver patent.

Therefore, the pivotal issues to be addressed below are (1) whether the equipment purchased by Bolser was susceptible

---

**17.** By way of illustration, Claim 1, the broadest of the two independent claims, can be found in

Appendix B.

of uses which did not infringe the Carver patent, and (2) whether by reason of Bolser's purchase of that equipment from Tire Retreaders, Inc. (TRI), a former Bandag franchisee, it acquired an implied license to use it in an infringing manner.

### B. *The Equipment Purchased*

The franchise agreement concluded in 1972 between Bandag and the predecessor of TRI, Standard Service Tire Co., Inc. (Standard), did not contain what was otherwise a customary clause in Bandag franchise agreements affording Bandag a 30-day option to repurchase all Bandag equipment in the possession of a terminated franchisee "at its eight year straight line depreciated value." If terminated, Standard would have been free to sell its old equipment in a competing market of potential buyers, the existence of which is not disputed. When Standard went out of the retreading business the following year, it formed TRI, to which it transferred the retreading equipment and franchise agreement with the consent of Bandag.

In September 1980 Bandag gave notice to TRI that the franchise agreement would be terminated. Thereafter, TRI, in an attempt to pay its debts to Bandag, undertook to sell its retreading equipment. A Bandag representative examined the equipment and offered $35,000–$40,000 for it. In January 1981 TRI received an offer of $70,000 from Puget Sound Tire Co. (Puget), which Bandag declined to match. Subsequently, Bolser also proposed to purchase the equipment for the price offered by Puget and was the first of the two to meet the terms of sale set by TRI.

Thus, on February 26, 1981, Bolser purchased equipment for setting up its own cold process recapping shop.[18] Though some of the equipment had been manufac-

tured by Bandag, none was covered by the Carver patent in view of our earlier conclusion that the claims of that patent are directed to a method. The testimony is consistent to the effect that during the sales negotiations between Bolser and TRI no discussion occurred about whether the equipment, once in the possession of one that was not a Bandag licensee, could be utilized without infringing.

Prompted by information obtained by its district manager, Scott Campbell, Bandag on March 6, 1981, sent Bolser a letter[19] which Bandag asserts was a warning about the possibility of infringement, if it used the equipment just purchased from TRI. Bolser disputes the clarity of this warning. Nevertheless, Campbell during his visit with Bolser's president, Alfred Bolser, on April 21, 1981, raised the problem of infringement. Later, after Bolser's recapping had begun, Campbell visited Bolser vice president Jerry Bolser at the new recapping facility and offered to repurchase the equipment, albeit for an amount less than that which Bolser had paid. Ultimately on December 9, 1981, Bandag sent Bolser a letter explicitly accusing it of infringing the Carver patent and threatening future legal action. In a letter dated December 14, 1981, Alfred Bolser responded that he did not believe his company was infringing. On February 3, 1982, Bandag filed suit. Mr. Bolser admitted that prior to that time he had not obtained advice of counsel regarding the charge of infringement. He said that his December 14 letter was only an expression of his "personal feeling."

The district court found that of the equipment purchased by Bolser the flanges, envelopes, and compression chambers had been "designed for the specific purpose

---

**18.** The following is listed on the invoice of TRI describing the equipment sold to Bolser:

1 buffer; 1 tire shoulder spreader; 1 stitcher; 1 slitter; 1 cushion (adhesive) applicator; 1 guillotine; 1 builder; 1 double chamber monorail; 2 compression chambers; 1 extruder; 1 cement pump; 1 steel rack; 164 rims and flanges; miscellaneous envelopes, innertubes, spare parts, and maintenance books.

Bolser's president testified that additional spreaders, an air compressor, and some miscellaneous items, such as additional curing tubes and envelopes were purchased elsewhere to complete the equipment used in the retreading plant. As a new building had to be erected to house this equipment, production did not begin until September 1981.

**19.** *See supra* note 13.

of enabling the franchisee to practice the method of retreading tires described in the Carver patent." The rest of the equipment was capable of noninfringing uses, in combination or individually, in other retreading processes.

Even as to the flanges, envelopes, and compression chambers, the district court found that if one or more of these items were modified, they could be used together without infringing the Carver patent. Modification of each pressure chamber through alteration of its overhead monorail and the addition of a vacuum pump, a pneumatics system, and certain electrical controls, all at a cost of $3,000, would have permitted use of the items in the recapping method of the AMF Flexcure System. Both Bandag expert Edward Wagoner and Bolser expert Robert Larson had seen this done. In the alternative, the flanges utilized in the Bandag method to secure the skirts of the flexible envelopes against the tire shoulder could have been modified by welding to the exterior thereof a gutter or ledge. An adjustable circular hoop could then have held the skirt of the envelope in place against the ledge to permit use of an unmodified Bandag chamber in the Harrelson process described in U.S. Patent No. 3,802,978 issued to Barnett (the Barnett patent).[20] No specific cost associated with this type of modification was adduced at trial.

All evaluations of the reasonableness of either type of modification in view of the cost of the equipment to be modified, the number of items needing modification, or the cost of additional components required to implement a noninfringing methodology, appear exclusively in the arguments of counsel. These are of little consequence on appeal, if not supported either by the record or by findings of the district court. In this instance, the district court found only that modification was required to escape infringement without further address-

ing the business reasonableness of doing so.

C. *Patent Infringement Liability*

██ The doctrine that the first sale by a patentee of an article embodying his invention exhausts his patent rights in that article, *see United States v. Univis Lens Co.*, 316 U.S. 241, 250–52, 62 S.Ct. 1088, 1093–94, 86 L.Ed. 1408, 53 USPQ 404, 408 (1942); *United States v. Masonite Corp.*, 316 U.S. 265, 277–78, 62 S.Ct. 1070, 1077, 86 L.Ed. 1461, 53 USPQ 396, 402 (1942), is inapplicable here, because the claims of the Carver patent are directed to a "method of retreading" and cannot read on the equipment Bolser used in its cold process recapping.

The district court concluded that the activities of Bolser would have infringed the Carver patent but for the circumstances surrounding the purchase of that equipment from TRI. Basically the court reasoned that the need to modify the equipment, to at least some extent, if infringement were to be avoided, and the failure of Bandag to prevent sale of the equipment to a non-franchisee, had the effect of extending to Bolser an implied license to use that equipment toward its most easily adaptable purpose, the practice of the Carver patent.

██ In a suit for patent infringement, the burden of proving the establishment of an implied license falls upon the defendant. *Bassick Manufacturing Co. v. Adams Grease Gun Corp.*, 54 F.2d 285, 286, 12 USPQ 78, 79 (2d Cir.1931). The evidence provided by Bolser to meet this burden fails in at least two respects.

██ First, no license can be implied, where as here, the equipment involved has other noninfringing uses, even if only as replacement parts. *See Lawther v. Hamilton*, 124 U.S. 1, 11, 8 S.Ct. 342, 347, 31 L.Ed. 325 (1888) (infringement of patented process). *Cf. General Electric Co. v. Con-*

**20.** Bolser has pointed out that, while rim modification could have rendered subsequent use of the purchased equipment free from charges of infringing the Carver patent, such a use may have resulted in subjecting Bolser instead to charges of infringing the Barnett patent. Such a possibility does not negate rim modification as a possible alternative to avoiding the infringement charged here.

*tinental Lamp Works, Inc.*, 280 F. 846, 851 (2d Cir.1922) (infringement of patented combination). At the very minimum, to avoid infringing the Carver process, Bolser could have resold the equipment it obtained from TRI either as a package [21] or on a piecemeal basis through publications such as the *Retreader's Journal.* The possibility also existed to modify some of the equipment. Bolser has not established that any of these options would have been unwise from a business standpoint. It may even have been reasonable to refrain from operating the equipment until expiration of the Carver patent on February 22, 1983, rather than to risk infringement. In this fashion the equipment would have been idle 24 months from its purchase, rather than for six, as actually occurred.

In any case, the possibility of infringement was simply ignored and never investigated by Bolser. Thus, the outcome of any business deliberation regarding whether to resell, modify, or idle the equipment was automatically weighted against doing so. Bolser does not argue that any disadvantage of these alternatives was ever actually considered before it commenced recapping; the arguments against the alternatives appear to have been generated entirely for this litigation. The salient fact remains that by not obtaining legal counsel, when it was made aware of the possibility of infringement, Bolser remained uninformed about the potential costs it risked in choosing not to avoid infringing.

> Where, as here, a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he [will be] infringing. Such an affirmative duty includes, *inter alia,* the duty to seek and obtain competent legal advice from counsel *before* the initiation of any possible infringing activity.

*Underwater Devices Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389–90, 219 USPQ 569, 576 (Fed.Cir.1983) (emphasis in original) (citations omitted). Bolser breached this duty. It has also failed to show that alternatives to infringement were unavailable or unreasonable.

Bolser's attempt to make out the defense of an implied license fails in a second respect.

> [T]he relatively few instances where implied licenses have been found rely on the doctrine of equitable estoppel .... One common thread in cases in which equitable estoppel applies is that the actor committed himself to act, and indeed acted, as a direct consequence of another's conduct. Thus, an implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party. One must have been led to take action by the conduct of the other party.

*Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1559, 219 USPQ 377, 383 (Fed.Cir.1983) (citations omitted). *See also Radio Corp. of America v. Andrea*, 90 F.2d 612, 615, 34 USPQ 312, 314 (2d Cir.1937) (terming the elements of estoppel the "controlling test"). "A mere sale does not import a license except where the circumstances plainly indicate that the grant of a license should be inferred." *Hunt v. Armour & Co.*, 185 F.2d 722, 729, 88 USPQ 53, 58 (7th Cir.1950).

Bolser argues that the deletion of the buy-back clause in Bandag's franchise agreement with Standard followed by its consent to the transfer of that agreement to TRI, or the failure of Bandag to meet the best offer received by TRI for the equipment ultimately purchased by Bolser, created an implied license that the equipment could be used by any purchaser in the method claimed in the Carver patent. This is untenable. The reliance required to establish estoppel cannot exist where Bolser has not been shown to have been aware of either of these actions by Bandag at the time Bolser purchased or subsequently proceeded to utilize the equipment from TRI in an integrated unmodified manner. *See,*

---

**21.** The president of Bandag licensee Phelps testified to the June 1981 package sale of equipment from its Port Angeles facility to a Bandag licensee located in the Philippines. The equipment had been sitting idle for two and one-half years.

*e.g., Young Engineers, Inc. v. United States International Trade Commission,* 721 F.2d 1305, 1317, 219 USPQ 1143, 1153 (Fed.Cir.1983). Unilateral expectations of an infringer are not converted into reliance by the discovery of third-party behavior about which the infringer was unaware at the time it acted to its detriment.

■ We therefore hold as incorrect the conclusion of the district court that an implied license of the Carver patent was extended to Bolser. The finding below of no patent infringement is accordingly reversed, and this case is remanded for a determination of appropriate relief.

Each party is to bear its own costs of this appeal.

AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART, AND REMANDED.

## APPENDIX A

Federal trademark and servicemark registrations to Bandag:

| Registration No. | Mark | Date of Registration |
|---|---|---|
| 693,857 | Trademark: BANDAG and Tire Tread Design<br>For: Preformed tread material, self-vulcanizing binder compositions and vulcanizing accelerator compositions all used in the repair of tires. | March 1, 1960 |
| 802,251 | Trademark: BANDAG<br>For: Preformed tread material, self-vulcanizing binder compositions, cushion gum, solvents, vulcanizing accelerator compositions, repair patches, all used in the repairing or recapping of tires. | Jan. 18, 1966 |
| 806,121 | Service Mark: BANDAG and Tire Tread Design<br>For: Tire recapping and repairing services. | March 22, 1966 |
| 812,106 | Trademark: BANDAG<br>For: Pressure chambers for recapping tires, tire buffers, adjustable metal bands used in recapping tires, tire tread rollers and stitchers, tire tread cutters, and bonding agent applicators used in recapping tires. | August 2, 1966 |

Registration Nos. 693,857 and 806,121 are for the word Bandag in the logo form utilized by Bolser in the 1981–82 Seattle Yellow Pages telephone directory.

## APPENDIX B

In Claim 1 below, paragraphing and bracketed material have been added.

"1. A method of retreading the road engaging surface of a tire comprising the steps of [:]

"[a.] forming an assembly of a tire casing, a prevulcanized tread superimposed on the peripheral road engaging surface of said tire casing, and a binding medium between said peripheral road engaging surface of said tire casing and said tread,

"[b.] enclosing the outside of said assembly within a flexible air-tight cover having side walls which extend over the shoulders of said tire casing,

"[c.] mounting said tire casing on a rim having peripheral flanges adapted to engage said shoulders, said cover side walls extending intermediate said shoulders and said flanges so as to be in sealing engagement therewith,

"[d.] establishing communication between the atmosphere and the space intermediate said cover and said assembly,

"[e.] inflating said tire casing with a fluid at a pressure greater than atmospheric pressure and simultaneously applying to

the outside of said cover a fluid pressure greater than atmospheric pressure but less than the inflating pressure,

"whereby said cover presses against the assembly at a pressure equal to the difference between the pressure applied to said cover and atmospheric pressure, at least in the region of said tread to expel air entrapped between said peripheral road engaging surface and said tread and uniformly press said tread against said peripheral road engaging surface during bonding of said tread to said peripheral road engaging surface without deformation of said tire casing."