951 F.2d 684
 21 U.S.P.Q.2d 1641
 TEXAS PIG STANDS, INC., Plaintiff-Appellant-Cross-Appellee,
v.
HARD ROCK CAFE INTERNATIONAL, INC.,
Defendant-Appellee-Cross-Appellant.
TEXAS PIG STANDS, INC., Plaintiff-Appellee,
v.
HARD ROCK CAFE INTERNATIONAL, INC., Defendant-Appellant.
 Nos. 90-5567, 91-5510.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 29, 1992.
 
 William G. Barber, Louis T. Pirkey, William D. Raman, Arnold, White & Durkee, Austin, Tex., Hull Youngblood, Small, Craig & Werkenthin, San Antonio, Tex., for plaintiff-appellant-cross-appellee.
 Ted D. Lee, Mark H. Miller, Gunn, Lee & Jackson, Frederick C. Shannon, Jr., Shannon & Weidenbach, San Antonio, Tex., Ralph W. Kalish, Jr., Peter S. Gilster, Donald J. Fitzpatrick, Ralph W. Kalish, Kalish & Gilster, St. Louis, Mo., for defendant-appellee-cross-appellant.
 Appeals from the United States District Court for the Western District of Texas.
 Before BROWN, JOHNSON, and BARKSDALE, Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 We traverse the barbecue heartland of the South to resolve this trademark dispute between Texas Pig Stands, Inc. (TPS), and Hard Rock Cafe International, Inc. ("Hard Rock" or "Hard Rock Cafe"). The controversy centers around the two restaurant chains' use of the term "pig sandwich" to describe a Tennessee dish of barbecued pig meat on wheat or white bun. TPS owns a registration on the term and brought suit contending that Hard Rock's use of it in its Dallas restaurant constituted an infringement on TPS' rights to the two-word title. TPS sought equitable relief and attorney's fees.
 
 
 2
 At the trial below, the jury agreed with TPS that Hard Rock was guilty of deliberate infringement on TPS' mark, which it determined was capable of registration, and concluded also that TPS could recover for Hard Rock's unjust enrichment. The trial court accepted the jury finding of infringement but reversed its finding of unjust enrichment, essentially granting a j.n.o.v. Consequently, the court refused to award TPS the profits Hard Rock gained from pushing the porcine fare under the "pig sandwich" moniker. Finally, the trial court awarded TPS attorney's fees. Both parties appealed to this Court.
 
 
 3
 We affirm the trial court's holding that the term "pig sandwich" is protectable and capable of registration. We also affirm the court's reversal of the jury finding of unjust enrichment. Finally, we conclude that the court abused its discretion in awarding TPS attorney's fees for bringing this litigation.
 
 This Little Piggy Went to Market
 
 4
 The pig sandwich's long and illustrious career has its origins in the hills of western Tennessee. The porcine delicacy has endeared itself to the hearts and stomachs of the citizenry there since the turn of the century. The founder of the Hard Rock Cafe, Isaac Tigrett, grew up in this area, and Jesse Kirby, one of the founders of the predecessor company to TPS, traveled extensively in the heartland of pig sandwiches in the early 1920's. Both men were apparently inspired by the dish's popularity and eventually included the garnished barbecued pork sandwich in their menus.
 
 
 5
 TPS' predecessor, Pig Stands Company, Inc. (Pig Stands), opened its very first "Pig Stand" in Dallas on September 15, 1921, which quickly enjoyed great success. In the early years of its operation, Pig Stands was in veritable hog-heaven, with over one hundred Pig Stands opening up from California to New York. The entire time, the term "pig sandwich" was used to describe its barbecued pork sandwich. The term had also become part of its distinctive sign,[1] menus, and promotional advertising items.
 
 
 6
 Alas, however, the nation's love affair with pig sandwiches eventually chilled, resulting in the widespread closing of most Pig Stands. The last Pig Stand in Dallas closed in September, 1985, and currently less than ten Pig Stands still operate in Texas.[2]
 
 
 7
 Tigrett first offered a barbecued pork sandwich with the name "pig sandwich" at the Hard Rock Cafe restaurant he opened in Jackson, Tennessee, in 1982. Tigrett later introduced the pig sandwich to New York and Stockholm, Sweden, when he opened Hard Rock Cafe restaurants in those cities. Then, in November 1986, just over a year after TPS closed its last Stand in Dallas, Tigrett opened up a Hard Rock Cafe restaurant there, featuring the pig sandwich on its menu.
 
 This Little Piggy Went to See His Lawyer
 
 8
 TPS notified Hard Rock in writing on October 20, 1987, of TPS' claim to rights to the term "pig sandwich" and demanded that Hard Rock cease its infringement. Hard Rock contends that at the time it did not know that TPS even existed, much less that it claimed any rights to the term "pig sandwich." Believing that it had the right to use the term "pig sandwich" as the generic name for its barbecued pork sandwich, Hard Rock refused to cease using it and instead chose to stay in its house and let TPS try to blow it down. Whether Hard Rock's legal edifice is made of brick, twigs, or straw remains to be seen.
 
 
 9
 TPS commenced this action against Hard Rock in 1989 claiming trademark and service mark infringement and unfair competition under the Lanham Act.[3] In its complaint, TPS requested a permanent injunction against Hard Rock's use of the term "pig sandwich," as well as an award of Hard Rock's profits, reasonable attorney's fees, prejudgment interest, and costs. The case was tried to a jury on nine special issues.[4] The jury found in favor of TPS on each issue, concluding both that Hard Rock's infringement was willful and that Hard Rock was unjustly enriched by its infringement.
 
 
 10
 The trial court conducted a post-trial hearing to consider the amount of Hard Rock's profits and the question whether TPS should be awarded attorney's fees. While the trial court found that Hard Rock profited from its sale of pig sandwiches, it refused to award any profits to TPS, stating that it was "convinced that [Hard Rock] would have sold just as many pig sandwiches by any other name." Further, the trial court asserted that "[t]he jury's finding of unjust enrichment is not supported by the record and cannot stand." The trial court then granted the sought-for injunction and, in a subsequent damages hearing, awarded attorney's fees and costs in excess of $400,000.
 
 
 11
 Neither party was pleased with this decision, and a flurry of appeals and cross appeals ensued. TPS contests the trial court's refusal to award profits in accordance with the jury's finding of unjust enrichment. Hard Rock returns the volley, contending that: (1) the trial court erred by excluding evidence and expert testimony regarding a prior court decision dealing with Pig Stands's use of "pig sandwich"; (2) this prior decision collaterally estops TPS' claim to exclusive rights to the contested term; (3) there was insufficient evidence to support the jury finding that "pig sandwich," standing alone, is a protectable mark, and that the trial court erred (4) in not cancelling TPS' registration for "pig sandwich," and (5) in awarding attorney's fees to TPS.
 
 Piggish Stands
 
 12
 Before we rush higgledy-piggledy into the questions which arise out of the trial court's damages hearing, we turn to the parties' assessments of the case's underlying merits.
 
 
 13
 Hard Rock first takes issue with the trial court's exclusion of evidence and testimony regarding Dixiepig Corp. v. Pig Stand Co., 31 S.W.2d 325 (Tex.Civ.App.1930). In that case, Pig Stands, TPS' predecessor, brought suit against Dixiepig Corporation to enjoin Dixiepig from using "pig sandwich," "Dixiepig Sandwich," or similar terms which Pig Stands argued constituted an infringement on its trademark. The fact that Dixiepig used these terms in the 1920's refutes the testimony of TPS' expert witness, Julius Lunsford, that there were "only two other entities in Texas that have used pig sandwich and both of them are far subsequent to the first use of the registrant in this case." When questioned in the absence of the jury about the Dixiepig case, Lunsford contradicted his testimony, admitting that others did use "pig sandwich" prior to TPS' predecessor.
 
 
 14
 The trial court did not permit Hard Rock to inform the jury either of Lunsford's contradictory admissions or of the facts and disposition of Dixiepig. Instead, the trial court permitted Hard Rock to read testimony from the Dixiepig transcript into the record. This was not in error. Whether a third party did indeed use the term "pig sandwich" prior to its registration by Pig Stands is insignificant under the circumstances. The term "pig sandwich" had become incontestable under 15 U.S.C. § 1065 (Supp.1990),[5] and thus such prior use may affect the mark's incontestability only if the third party used the mark prior to its registration by Pig Stands and has continued to use it since that time. See Casual Corner Assocs., Inc. v. Casual Stores of Nevada, Inc., 493 F.2d 709 (9th Cir.1974). No such continuing use has been alleged. Once a mark has become incontestable under § 1065, the registration constitutes "conclusive evidence" of the registrant's right to use the mark, "subject only to the seven defenses enumerated in 15 U.S.C. § 1115(b)."[6] Soweco, 617 F.2d at 1184. Prior use by a third party that does not continuously extend up until the time of trial does not fall within one of the enumerated defenses. Allowing the introduction of the Dixiepig opinion for the purpose of refuting Lunsford's testimony, therefore, would not have served any legitimate purpose but would only have confused the jury. Indeed, the trial court gave Hard Rock considerable leeway in allowing it to read testimony from the Dixiepig transcript into the record over TPS' objections.[7]
 
 
 15
 Collateral Estoppel--Does the Pork Stop Here?
 
 
 16
 In contrast, Hard Rock argues that Dixiepig goes beyond mere similarity. Hard Rock argues that the issues there and here are identical, and thus Dixiepig should collaterally estop TPS from claiming that "pig sandwich" is an incontestable mark. Again, we disagree. Hard Rock bases its contention upon Dixiepig 's 1930 holding that Pig Stands could not appropriate the words "pig sandwich". Therefore, as Hard Rock's reasoning goes, TPS cannot do so now. However, the stringent requirements of collateral estoppel create a difficult hurdle for Hard Rock's argument to clear. Before collateral estoppel can bar a lawsuit, three elements must exist: (1) the issue at stake must be identical to the one involved in the prior litigation; (2) the determination of the issue in the prior litigation must have been a critical, necessary part of the judgment in that earlier action; and (3) the special circumstances must not exist which would render preclusion inappropriate or unfair. Montana v. United States, 440 U.S. 147, 154, 99 S.Ct. 970, 974, 59 L.Ed.2d 210, 217 (1979). See also, In re Lewisville Properties, Inc., 849 F.2d 946, 949 (5th Cir.1988) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)); Hicks v. Quaker Oats Co., 662 F.2d 1158, 1166 (5th Cir.1981). Complete identity of the parties in the two suits is not required. Allen v. McCurry, 449 U.S. 90, 94-95, 101 S.Ct. 411, 414-15, 66 L.Ed.2d 308, 313 (1980).
 
 
 17
 While Dixiepig might satisfy the three main elements of collateral estoppel, it does not provide a clear and coherent holding from which the trial court could have determined whether collateral estoppel would apply. The Dixiepig court found "pig sandwich" to be unprotectable for two conflicting reasons--one which, if standing alone, would collaterally estop all litigation in this case, and another which, if standing alone, would not. Dixiepig 's assertion that "[t]he words 'pig sandwiches' are purely common English words, generic," 31 S.W.2d at 328 (emphasis added), would estop the present litigation, as generic terms can never attain trademark protection. Zatarains, Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 790 (5th Cir.1983). However, Dixiepig also holds that "the evidence failed to show that ['pig sandwich'] had generally acquired a secondary meaning, ... said words so employed being descriptive...." 31 S.W.2d at 327 (emphasis added). Because this second reason fundamentally conflicts with the first, the decision in Dixiepig wallows in a pig sty of confusion.
 
 
 18
 Viewing "pig sandwich" as descriptive, rather than generic, makes it possible that the term could attain protectable status if it acquired a secondary meaning.[8] Whether "pig sandwich" has acquired a secondary meaning greatly depends on whether the question is asked in 1930, shortly after the incipience of Pig Stands, or in 1990. The jury findings attest that over sixty-five years of the proliferation of Pig Stands and "The Sign of the Pig" throughout the country has led the consuming public automatically to associate the term "pig sandwich" with TPS.[9] While "pig sandwich" may not have had a secondary meaning in 1930, a crucial decision of the Dixiepig case, the jury finding to the contrary sixty years later affirms that a factual change has perhaps altered the basis upon which Dixiepig depended.[10] Thus, collateral estoppel cannot apply. See 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice § 0.448, at 837 (1988) (where an intervening factual change has altered the basis upon which the earlier judgment depended, collateral estoppel will not apply).
 
 
 19
 A Pig is a Pig is a Pig--Or is it?
 
 
 20
 Undaunted by these setbacks, Hard Rock now charges full-boar into the fundamental issue of whether sufficient evidence exists to support the jury's finding that the term "pig sandwich," standing alone, is a protectable mark. In order to successfully overturn this jury finding, we must find that the facts and inferences point so strongly and overwhelmingly in favor of the complaining party that reasonable men could not have arrived at that finding. See Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969) (en banc). Thus, we must determine whether the jury had before it sufficient competent evidence that fairly supports the finding. See Conan Properties, Inc. v. Conans Pizza, Inc., 752 F.2d 145, 149 (5th Cir.1985).
 
 
 21
 The trial court denied Hard Rock's motion for a directed verdict because "pig sandwich" was generic as the name of a product. The jury later concluded that the mark was protectable. Much turns on these decisions, for if "pig sandwich" is a generic term, it cannot attain protectability; or, if it has become generic over time, 15 U.S.C. § 1064(c) provides for the cancellation of its registration.
 
 
 22
 Indeed, the determination is a close one. A generic term refers to "a particular genus or class of which an individual article or service is but a member," Vision Center v. Opticks, Inc., 596 F.2d 111, 115 (5th Cir.1979), cert. denied, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980), suggesting the "basic nature of articles or services." American Heritage Life Ins. Co. v. Heritage Life Ins. Co., 494 F.2d 3, 11 (5th Cir.1974). A descriptive term, on the other hand, "identifies a characteristic or quality of an article or service," Vision Center, 596 F.2d at 115, such as, "for example, its color, odor, function, dimensions, or ingredients." Soweco, 617 F.2d at 1183 (emphasis added). If TPS had claimed the rights to either of the terms, "pig" or "sandwich," standing alone, without a doubt such a term would be generic, and thus unprotectable. When these two words are combined, however, they may attain protectable status. See Association of Co-op Members, Inc. v. Farmland Indus., Inc., 684 F.2d 1134, 1140 (5th Cir.1982) (holding that unprotectable words "may, when used in combination, become a valid trademark").
 
 
 23
 We are not called upon to make, on our own, an original determination of whether the term "pig sandwich" is generic or descriptive. Rather, we are to decide whether "all of the evidence[,] ... facts and inferences point so strongly and overwhelmingly" in favor of Hard Rock's position that "pig sandwich" is an unprotectable, generic term "that reasonable men could not arrive at a contrary verdict," requiring the grant of Hard Rock's directed verdict motion. See Boeing, 411 F.2d at 374.
 
 
 24
 Both parties provided persuasive evidence, with dueling experts for both Hard Rock and TPS offering their opinions. The trial court's explanatory instruction on the special interrogatories to the jury contrasted what constituted generic and descriptive terms and provided the jury with a firm, clear, guiding standard. Given that there was substantial evidence opposed to Hard Rock's motion, "that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions," id., the motion was properly denied. The case was properly submitted to the jury, therefore, and its decision, although a difficult one to make, is binding.
 
 
 25
 Upholding the determination of non-genericness, however, will not save "pig sandwich" 's bacon on its own. Descriptive marks are not automatically protectable, 15 U.S.C. § 1052(e)(1),[11] but if they acquire secondary meaning for the consuming public, they may be registered.[12] Because the question of acquiring secondary meaning turns entirely upon "the primary significance of the term in the minds of the consuming public" of the relevant geographical market,[13] the Boeing standard becomes nearly insuperable for Hard Rock. While we may not be schooled in the ways of the pig sandwich phenomena that has swept through parts of this Circuit over the past sixty years, a jury in San Antonio, one of the last remaining oases of TPS, provides, on the basis of evidence before it, an acceptable indicator of the "minds of the consuming public." Several Texas citizens testified to having fond memories of TPS' porcine specialty, supporting TPS' contention that over sixty years of "pig sandwiches" and "The Sign of the Pig" had linked the swining and dining. For these reasons, we cannot say that the jury's decision was unfounded.
 
 
 26
 Fraud in the Registration--Did a Greased Pig Slip Past the PTO?
 
 
 27
 Hard Rock argues next that the trial court erred in refusing to cancel TPS' registration of "pig sandwich". Hard Rock seeks to utilize 15 U.S.C. § 1064, which provides, in part, for the cancellation of a registration if (i) the registered mark becomes a generic name for the goods or services, or (ii) its registration was obtained fraudulently. As for the first factor--transmutation of the mark to genericness, our preceding discussion to the contrary quickly dispenses with this argument.
 
 
 28
 As for the second factor--fraud in obtaining registration, the trial court made a finding of fact that such fraud did not occur, which the Court may reverse only if it is "clearly erroneous," Fed.R.Civ.P. 52(a), that is, if we are convinced that the trial court made a mistake. Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co., 676 F.2d 1079, 1082 (5th Cir.1982).[14] Once again Dixiepig raises its ugly snout: Hard Rock argues that by failing to disclose this decision to the PTO when obtaining the registration of "pig sandwich," and later when procuring the term's incontestability status, Pig Stands committed fraud upon the PTO. Hard Rock points to the oath Margaret Golden, Pig Stands's President, took before registering "pig sandwich" as a design service mark, that:
 
 
 29
 ... to the best of her knowledge and belief no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as to be likely, when applied to the goods of such other person to cause confusion, or to cause mistake, or to deceive.
 
 
 30
 (Emphasis added.) With knowledge of Dixiepig, Hard Rock claims, TPS and its predecessor knew that a court had determined that the Dixiepig Corporation had the right to use "pig sandwich," or a term so similar to it that confusion would result.
 
 
 31
 From the pig pen of confusion in Dixiepig we are unable to root out such a finding. Dixiepig, in fact, held quite the opposite: "[W]e do not think it can be drawn [from the evidence] that there exists any conflict between same, either in the language used or in the symbols.... We have not been able to gather [from the evidence] any similarity further than that which exists between hogs generally...." 31 S.W.2d at 327. Consequently, Hard Rock's fraud contention for the initial registration fails at the outset--no material misrepresentation.
 
 
 32
 As for TPS' filing for incontestability under § 1065, Hard Rock points to the affidavit signed by Hawkins Golden, Pig Stands's Chairman of the Board: "[T]here has been no final decision adverse to registrant's claims of ownership of said mark, to its right to register the same or maintain it on register." Despite Hard Rock's firm belief to the contrary, Dixiepig does not constitute a "final decision adverse" to Pig Stands's claim of ownership to "pig sandwich". Rather, Dixiepig dissolved a temporary injunction restraining Dixiepig Corporation from using the terms "Dixiepig Sandwich" and "Dixiepig Stand," basing this decision on the grounds that no conflict existed between the terms used by Dixiepig and those used by Pig Stands. Although the case questioned whether anyone could appropriate the words "pig sandwich," the court did not invalidate the mark in its decision. Further, as we have explained above, Dixiepig arguably stands for the proposition that "pig sandwich" is a descriptive term that did not have secondary meaning at that time. Dixiepig, therefore, would not finally determine Pig Stands's claim to ownership, because the term could eventually acquire a secondary meaning. Again, Hard Rock's fraud allegations fail at the outset--no material misrepresentation.
 
 
 33
 Unjust Enrichment--Did Hard Rock Bring Home the Bacon?
 
 
 34
 With the underlying determination of the protectability of "pig sandwich" intact, we move on to the trial court's rejection of the jury's unjust enrichment finding.[15] As TPS argues, the trial court's order vitiates the jury findings, effectively granting partial j.n.o.v. against TPS. During the post-trial damages hearing, the trial court stated: "having heard all the evidence in the case, [the court] is of the opinion that monetary relief is not warranted in this case." Later in its holding, however, the court specifically rejected the jury finding of unjust enrichment.[16]
 
 
 35
 Had the court gone no further than its first statement, and not overturned the jury finding, we would review this issue under a much different standard. Under 15 U.S.C. § 1117(a) (Supp.1990), the trial court has wide discretion to increase or reduce the amount of profits recoverable by the plaintiff "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive ... according to the circumstances of the case." Under an abuse of discretion standard, we would have little difficulty upholding the trial court's determination that monetary relief is not warranted. See id. However, because the court did not merely adjust the amount of the recovery, but rather threw out the jury finding for recovery altogether, we must again apply the Boeing standard. See e.g., Oxford Indus. Inc. v. Hartmarx Corp., 15 U.S.P.Q.2d 1648, 1655 (N.D.Ill.1990) (while the origins of unjust enrichment are both legal and equitable, a jury finding of fact in favor of unjust enrichment may be overturned "only under the standards for granting a motion for judgment notwithstanding the verdict") (citing Hussein v. Oshkosh Motor Truck Co., 816 F.2d 348, 355 (7th Cir.1987).
 
 
 36
 The definition of unjust enrichment provided to the jury[17] accurately frames the questions that must be answered here: (i) Would Hard Rock's retention of its profits for pig sandwich sales be unjust and inequitable? and (ii) Did Hard Rock use the reputation and good will of TPS to sell its own pig sandwiches? In assessing the evidence presented, while no single evidentiary fact carries the day, from the totality of the circumstances present we conclude that the jury did not have before it sufficient competent evidence "of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment," Boeing, 411 F.2d at 374, might arrive at a finding of unjust enrichment.
 
 
 37
 (i) Palming Off--A Pork Purveyor Has His Pride
 
 
 38
 Returning to the origins of the pig sandwich, we first point out that the term was widely used in Tennessee in the early 1920's as providing the impetus for its being included in Hard Rock menus in Jackson, New York, and Stockholm as early as 1982. Consequently, when Hard Rock came to Dallas, it brought the term "pig sandwich" with it. The great weight of the evidence supports Hard Rock's position that its use of "pig sandwich" had nothing whatsoever to do with TPS' use of the term. At no time have TPS and Hard Rock either competed or operated restaurants in the same town simultaneously. In fact, TPS left the Dallas market over a year prior to Hard Rock's entering it, and other restaurants had been and were currently using a similar, if not identical, term in their menus.[18] Consequently, the trial court described the situation best: "[W]hile the Court believes defendant sold pig sandwiches knowing of plaintiff's mark, it appears this was done not as an attempt to profit from the mark but rather in simple disregard of plaintiff's rights." Furthermore, as the court aptly stated: "the high degree of success [Hard Rock has] enjoyed all over the world militates against the existence of any motive to seek such an association or to use pig sandwiches to promote its overall restaurant operations."
 
 
 39
 On a review of the evidence, we conclude that there is simply no indication that Hard Rock attempted to "palm off" its pig sandwiches as those of TPS, nor did they attempt to associate their operation with TPS.[19] TPS acknowledges that it did not lose a single sale due to Hard Rock's use of "pig sandwich." While the diversion of sales is not a prerequisite to an award of profits, Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582, 585 (5th Cir.1980), it is one of the factors to be considered. Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 919 (Fed.Cir.1984). The same is true of palming off--while it is not a prerequisite to finding unjust enrichment, it is an important circumstance bearing on the determination. Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 130, 67 S.Ct. 1136, 1139, 91 L.Ed. 1386, 1391 (1947). Here, the total absence of all of these factors fatally undercuts the jury's conclusion.[20] See Bandag, 750 F.2d at 917-19 (no equitable recovery without showing of fraud or palming off; examination of the record did not reveal any evidence showing that plaintiff had lost substantial business and profits as a result of defendant's unfair competition). Compare Maltina, 613 F.2d at 583, 585 (finding unjust enrichment after defendant went ahead and began producing and distributing product under a trademark that had been rejected by the PTO and with full knowledge of plaintiff's rights to the mark); W.E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 662 (2nd Cir.1970) (finding unjust enrichment after defendant sold a product with plaintiff's mark "in the teeth of the patent office's refusal to register" that mark).
 
 
 40
 (ii) Did Hard Rock Hog TPS' Good Will?
 
 
 41
 We also do not find any evidence whatsoever of Hard Rock's using TPS' good will to sell its pig sandwiches. As the trial court pointed out, while "there are people in Dallas with vivid memories of [TPS], there was no proof as to the value of plaintiff's good will in Dallas today." Indeed, despite being high on the hog decades ago, the closing of practically all the Texas Pig Stands, and all outlets in Dallas well prior to Hard Rock's entry into that market, evidences the fact that TPS' good will there is between low and nill. The trial court correctly concluded, therefore, that Hard Rock "would have sold just as many pig sandwiches by any other name" and that "there is no basis for inferring that any of the profits received by [Hard Rock] from the sale of pig sandwiches are attributable to infringement."
 
 
 42
 In sum, we hold that the evidence before the jury simply was not of the quality and weight necessary to support a finding of unjust enrichment. See Boeing, 411 F.2d at 374. The granted permanent injunction adequately remedies the complained-of infringement, and awarding TPS any of Hard Rock's profits would be far from equitable--it would be a windfall. See Bandag, 750 F.2d at 917-18 (plaintiff is not entitled to a windfall of profits if an injunction alone will satisfy the equities of the case).
 
 
 43
 Award of Attorney Fees--Did the Trial Court Go Hog Wild?
 
 
 44
 After throwing out the jury's unjust enrichment finding at the post-trial damages hearing, the trial court also determined that this case was "exceptional" under § 1117(a),[21] and awarded attorney's fees to TPS accordingly. Under this section of the Lanham Act, the trial court judge may, in his discretion, award attorney's fees in "exceptional" cases to the prevailing party. Hard Rock contests this determination, arguing that this case fell far short of the interpretation the courts have uniformly given to the term "exceptional."
 
 
 45
 We emphasize that here we are not dealing with the Boeing sanctity of the jury verdict. Imposition of attorney's fees on the unsuccessful infringer is not a matter for the jury. In the first place, the unique situation of this case and its trial reflects that no monetary awards were before the jury on the infringer's substantive liability.[22] More than that, the imposition of attorney's fees by nature and statute, see 15 U.S.C. § 1117(a), is reserved to the trial judge. This means that, unlike a jury verdict or a finding of fact as such, the standard or review is whether the court abused its discretion. For the reasons set forth, we hold that it did.
 
 
 46
 In support of the award, the trial court determined that Hard Rock acted "in simple disregard of plaintiff's rights." This disregard, the trial court held, made the case "exceptional." The trial court then justified this holding by making a notable observation which reveals its true conception of "exceptional":
 
 
 47
 The large, prosperous company was unwilling to show any respect to the smaller, struggling business.... The larger, guilty company can more easily absorb the loss than the smaller, innocent one. If plaintiff had to pay its own fees, it would suffer for having to protect its trademark and service mark rights.
 
 
 48
 This noble sentiment, perhaps fitting for Sherwood Forest, does not meet the congressional standard of "exceptional." The legislative history of § 1117 suggests that an "exceptional case" is one in which the defendant's trademark infringement "can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.' " S.Rep. No. 93-1400, 93rd Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 7132, 7133. The statutory provision has been interpreted by courts to require a showing of a high degree of culpability on the part of the infringer, for example, bad faith or fraud. See Baskin-Robbins Ice Cream v. Pillsbury Co., 1 U.S.P.Q.2d 1223, 1224 (N.D.Tex.1986); see also Joy Mfg. Co. v. CGM Valve & Gauge Co., Inc., 730 F.Supp. 1387, 1395 (S.D.Tex.1989) (attorney's fees awarded where defendant reconditioned and painted valves and affixed unauthorized new name plates to make valves look like new); compare V.I.P. Foods, Inc. v. Vulcan Pet, Inc., 675 F.2d 1106, 1107 (10th Cir.1982) (refusing to award attorney's fees where the court found that defendant had no intent to deceive or confuse the public). On the other hand, the parties' relative economic positions should not enter into the determination, even when an award of punitive damages would serve as an example to deter other infringers. As one court has stated:
 
 
 49
 [Plaintiff] gives a persuasive argument as to the sound reason for allowing attorney's fees, that is to seek to prevent by example others from pirating trademarks belonging to those who have them registered and who will properly and legally be using them and that argument has great merit and perhaps should be the law, but as I read the statute it is not the law.
 
 
 50
 Plough, Inc. v. Sun Fun Prods., Inc., 200 U.S.P.Q. 236, 237 (M.D.Fla.1977).[23]
 
 
 51
 The trial court pointed to the jury determination that Hard Rock's infringement was willful in an attempt to bring its determination in line with this established precedent, but this attempt is unavailing. A jury finding of willfulness does not bind the trial court in determining whether this case is "exceptional";[24] it may, however, serve as a guide. Here, the guide is a poor one due to the definition of "willful" provided in the special interrogatories: "An act is done 'willfully' if it is done voluntarily and intentionally and not because of accident or other innocent reason." This standard falls far short of the kind of culpability required to render a case "exceptional." While we do not condone Hard Rock's infringement, its actions do not approach "deliberate pirating" or "egregious conduct."[25]
 
 
 52
 The trial court's own conclusions built Hard Rock's house, brick by brick, that neither the court nor TPS could blow down--one wall, the absence of palming off; the second wall, the lack of any intent to deceive or confuse; the third wall, the lack of any attempt to profit from such infringement; and to complete the structure, the finding of a total lack of any damage or hardship to TPS' business and good will. Hard Rock's financial success and size do not undermine this construction; these facts do not even enter into it. This being an "unexceptional" case, we hold that the trial court abused its discretion in awarding attorney's fees to TPS under § 1117(a).
 
 
 53
 D-D-Dt D-D-Dt That's All, Folks!
 
 
 54
 TPS now leaves this legal barnyard with its mark intact, but we cannot allow it to attain a windfall on account of Hard Rock's infringement. While the jury had sufficient evidence to find "pig sandwich" to be a descriptive mark that had acquired secondary meaning, Hard Rock's infringement merits only the grant of a permanent injunction, and not an award of profits. Furthermore, though not entirely kosher, Hard Rock's actions were not sufficiently swinish to bring this case to the "exceptional" level required for an award of attorney's fees. Thus, the trial court order granting a permanent injunction for trademark infringement and denying the award of profits is AFFIRMED, and the order awarding attorney's fees is REVERSED.
 
 
 55
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 56
 JOHNSON, Circuit Judge, dissenting.
 
 
 57
 Regrettably, I cannot agree with the majority's view of this case, and therefore must respectfully dissent.
 
 
 58
 To understand the essence of this dissent it is necessary to recite a number of critically important jury findings. The jury found that Hard Rock used an imitation of Texas Pig Stands' registered trademark. The jury found that the imitation trademark used by Hard Rock was similar enough to Texas Pig Stands' mark that it was likely to confuse consumers as to whether the product was sponsored or endorsed by Texas Pig Stands. The jury found that Hard Rock used the imitation of Texas Pig Stands' mark willfully and in bad faith, maliciously, or fraudulently. All of these jury findings are amply supported by the evidence. None of these findings has been set aside or overturned.
 
 
 59
 Despite the majority's attempt to diminish the jury's finding of a knowing, deliberate infringement, the majority quotes with seeming approval the district court's assessment of the evidence that the "defendant sold pig sandwiches knowing of plaintiff's mark ... in simple disregard of plaintiff's rights." There can be no question that Hard Rock deliberately infringed on Texas Pig Stands' trademark. It knew of that mark and openly refused to honor it. In such a case, trademark law demands that the infringer be penalized, lest such infringement be encouraged and the valuable protections of the trademark laws vitiated. Mistakenly, in this writer's opinion, the majority today goes to great lengths to avoid imposing any penalty whatsoever on an admittedly willful and deliberate infringer.
 
 
 60
 Upon a finding of a knowing trademark violation, the victim of the violation is entitled to both injunctive and monetary relief. 15 U.S.C. §§ 1114, 1117. There is no question here that it was appropriate to enjoin Hard Rock from further use of Texas Pig Stands' mark in the future. The question here is whether Texas Pig Stands should have been afforded any monetary recovery for previous violations. The prior cases of this Court and the purposes of the trademark laws demand that Hard Rock be required to pay a monetary penalty, in order to render its deliberate infringement unprofitable.
 
 
 61
 The possible monetary remedies for trademark infringement include
 
 
 62
 (a) the profits acquired by the defendant as a result of its infringement,
 
 
 63
 (b) the damages sustained by the trademark owner,
 
 
 64
 (c) the costs of the action, and
 
 
 65
 (d) in an "exceptional case," reasonable attorneys' fees.
 
 
 66
 15 U.S.C. § 1117(a) (emphasis added). See also Bandag, Inc. v. Al Bolser's Tire Stores, 750 F.2d 903, 917 (Fed.Cir.1984). The district court is given great discretion to fashion an equitable remedy. 15 U.S.C. § 1117(a); Bandag, 750 F.2d at 917.
 
 
 67
 This is not the first time this Court has addressed the issue of whether a plaintiff should have any monetary recovery if it has not itself suffered any lost sales or other damages as a result of a defendant's willful infringement. Just over a decade ago, this Court was faced with a similar case--one in which the infringer acted knowingly and deliberately, yet did not cause the victim to lose any sales. We there noted initially that the Lanham Act, and in particular 15 U.S.C. § 1117, "entitles a markholder to recover, subject to the principles of equity, the profits earned by a defendant from infringement of the mark." Maltina Corp. v. Cawy Bottling Co., Inc., 613 F.2d 582, 584 (5th Cir.1980). The question, though, was whether the plaintiff should recover those profits even if it had not itself lost any profits or sales as a result of the infringement.
 
 
 68
 The courts have expressed two views of the circumstances in which an accounting is proper under 15 U.S.C. Section 1117. Some courts view the award of an accounting as simply a means of compensating a markholder for loss or diverted sales. Other courts view an accounting not as compensation for lost or diverted sales, but as redress for the defendant's unjust enrichment and as a deterrent to further infringement. See Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 121 (9th Cir.), cert. denied, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968).... Accordingly, we must decide whether diversion of sales is a prerequisite to an award of an accounting. We hold that it is not.
 
 
 69
 In Maier Brewing the Ninth Circuit awarded an accounting to a plaintiff who was not in direct competition with a defendant and who, accordingly, had not suffered any diversion of sales from the defendant's infringement. The court noted that the defendant had wilfully and deliberately infringed. It reasoned that awarding an accounting would further Congress' purpose in enacting 15 U.S.C. Section 1117 of making infringement unprofitable. This Court is in accord with this reasoning.
 
 
 70
 Id. at 584-85 (emphasis added). This Court observed that an accounting "serves two purposes: remedying unjust enrichment and deterring future infringement." Furthermore, the Court recognized that because an accounting alone does not render infringement unprofitable, it "will not adequately deter future infringement." Id.
 
 
 71
 In this case there were two potential penalties which might, in equity, have been imposed on Hard Rock for its deliberate violation of federal law. Either would have rendered Hard Rock's infringement unprofitable and provided an appropriate deterrent. Based on the facts found by the jury, the district court in this case could have either 1) forced Hard Rock to disgorge the profits it made selling food under Texas Pig Stands' trademark, or 2) compelled Hard Rock to pay Texas Pig Stands' attorneys' fees. The district court, exercising its discretion to fashion an equitable result, chose the second of these options. The majority of this panel, substituting its judgment for that of the district court, now refuses to allow the imposition of any penalty and allows Hard Rock to keep whatever profits accrued from Hard Rock's willful and deliberate infringement.
 
 
 72
 There should be no question that the district court could have either awarded Texas Pig Stands the profits earned by Hard Rock or could have awarded Texas Pig Stands its attorneys' fees. Section 1117 plainly allows an award of the infringer's profits upon a showing of a knowing violation, and the majority acknowledges that Texas Pig Stands need not have proved that it lost any sales in order to recover Hard Rock's profits. Supra, at 695. Thus, while the district court was not required to do so, it certainly had the authority to award Hard Rock's profits to Texas Pig Stands. In the judgment of the district court, however, such an award was not required to reach an equitable result, and the district court thus exercised its discretion to deny such an award.
 
 
 73
 At the same time, however--and as part of its equitable resolution of this matter--the district court determined that it would be inequitable and unjust to require Texas Pig Stands to bear the expense and burden of defending its mark, when the only result would be an injunction forbidding continuednfringement. After all, while the injunction might restore the status quo ante, the victim of the infringement, Texas Pig Stands, has had to bear the entire burden of the past infringement. Refusing to inflict such a Pyrrhic victory on Texas Pig Stands, the district court required Hard Rock to pay Texas Pig Stands' attorneys' fees. The majority now sets aside the judgment of the district court, makes its own determination of the equities of this fact sensitive case, and decrees a new and different result. The majority's proffered reason is that this is not an "exceptional" case and Texas Pig Stands therefore does not qualify for attorneys' fees. The short answer to this assertion is that, as the majority seemingly acknowledges, the legislative history of section 1117 makes plain that an exceptional case is one in which the infringement is "deliberate" or "willful." Supra, at 696. Here the jury made a specific finding that the infringement was willful. Furthermore, the majority admits that the infringement was knowing and deliberate. Supra, at 697. Clearly, this case not only qualifies as one in which attorneys' fees are available but also calls out for such a result.
 
 
 74
 The majority's oft-expressed concern about a "windfall" for the plaintiffs has led it to an unjust and unwarranted result. For one thing, there would be no windfall here. Awarding attorneys' fees to Texas Pig Stands would not in any way constitute a windfall--such fees would do no more than provide appropriate compensation to Texas Pig Stands for its efforts to vindicate its protected economic rights. Moreover, even if there were a windfall, certainly it is far better to allow a windfall to the innocent victim than to place the entire burden of the litigation on that victim and allow the culpable party to profit from its infringement.
 
 
 75
 The message conveyed by the majority's determination here is that despite what this Court has heretofore written, it may now be permissible and profitable to infringe on the trademark of another. While the Fifth Circuit might eventually put a stop to that illegal infringement, that infringement nonetheless still could be profitable. The trademark laws generally, and section 1117 in particular, do not countenance such a result. The message this Court should send is that infringement--and particularly the knowing, deliberate, and willful infringement--will have two consequences. It will be enjoined and it will be made unprofitable.
 
 
 76
 As the majority does not send that message, I must respectfully dissent.
 
 
 
 [1]
 The design was developed in 1922, and later became a historical neon sign, aptly described by the Texas Court of Civil Appeals as "a picture of a pig in a natural walking position, head down, with the words 'Pig Sandwich' extending from shoulder to hind leg, midway of the body of the hog." Dixiepig Corp. v. Pig Stand Co., 31 S.W.2d 325 (Tex.Civ.App.1930). This design is also cryptically referred to as "The Sign of the Pig." Pig Stands originally registered the design mark for sandwiches in the U.S. Patent Office in 1924, but did not renew the registration. Then, in 1965, TPS assumed the sole operation of the Pig Stands business and received an exclusive license to use the marks of the Pig Stands business in the state of Texas. On the application for this license, the trademark or service mark that TPS sought to register was " 'Pig Sandwich' superimposed on outline drawing of a pig." Later, in 1971, TPS registered the mark for restaurant services with the U.S. Patent Office
 
 
 [2]
 The nine Pig Stands operating in Texas at the commencement of this action included four in San Antonio, three in Beaumont, and two in Houston
 
 
 [3]
 15 U.S.C. §§ 1051-1127 (1988)
 
 
 [4]
 The jury answered the following special interrogatories in favor of TPS:
 (1) Did Texas Pig Stands prove ... that Hard Rock Cafe uses a colorable imitation of the mark registered in No. 921,278 in connection with the sale of the goods or services in question, which use is likely to confuse consumers as to the source, sponsorship or endorsement by Texas Pig Stands of such goods and services?
 (2) Did Hard Rock Cafe prove ... that the mark registered in No. 921,278 is merely descriptive of restaurant services and did not, in August of 1977, have secondary meaning?
 (3) Do you find ... that Texas Pig Stands has abandoned the mark registered in No. 921,278 for restaurant services in the relevant market?
 (4) Did Texas Pig Stands prove ... that the term "Pig Sandwich" standing alone, is a protectable mark?
 (5) Did Texas Pig Stands prove ... that the use of "Pig Sandwich" by Hard Rock Cafe is likely to confuse consumers as to the source, sponsorship or endorsement by Texas Pig Stands of the product or service in question?
 (6) Did Texas Pig Stands prove ... that such use of "Pig Sandwich" by Hard Rock Cafe was done willfully and in bad faith or maliciously or fraudulently in order to obtain some advantage from the goodwill or good name of Texas Pig Stands?
 (7) Do you find ... that Texas Pig Stands has abandoned the use of "Pig Sandwich" for a product in the relevant market?
 (8) Did Hard Rock Cafe prove ... that it has used "Pig Sandwich" otherwise than as a trademark or service mark and only to describe to users fairly and in good faith the goods or services of Hard Rock Cafe?
 (9) Did Texas Pig Stands prove ... that Hard Rock Cafe has been unjustly enriched by its use of "Pig Sandwich"?
 
 
 [5]
 If a registrant has used his mark in connection with the goods or services specified on his registration for five continuous years after the registration date, his mark is deemed "incontestable" under § 1065. Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1184 (5th Cir.1980). However, if it is determined that the mark is generic, it can never become incontestable. 15 U.S.C. § 1065(4). We will reach the question of whether "pig sandwich" is generic shortly
 
 
 [6]
 After the 1988 amendment, there are now eight defenses under § 1115(b):
 (1) That the registration or the incontestable right to use the mark was obtained fraudulently; or
 (2) That the mark has been abandoned by the registrant; or
 (3) That the registered mark is being used, by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the source of the goods or services on or in connection with which the mark is used; or
 (4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or the geographic origin; or
 (5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to (A) the date of constructive use of the mark established pursuant to section 1057(c) of this title, (B) the registration of the mark under this chapter if the application for registration is filed before the effective date of the Trademark Law Revision Act of 1988, or (C) publication of the registered mark under subsection (c) of section 1062 of this title: Provided, however, That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or
 (6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: Provided, however, that this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or
 (7) That the mark has been or is being used to violate the antitrust laws of the United States; or
 (8) That equitable principles, including laches, estoppel, and acquiescence, are applicable.
 
 
 [7]
 Moreover, as it applies to the protectability of "pig sandwich," the Dixiepig decision is probably inadmissible hearsay. See Greycas v. Proud, 826 F.2d 1560, 1567 (7th Cir.1987), cert. denied, 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988) (holding that civil judgments are not "usable in subsequent proceedings as evidence of the facts underlying the judgment; for as to those facts, the judgment is hearsay"). Additionally, there is a considerable danger of the jury giving too much weight to the Dixiepig opinion, as "[i]t is possible that a jury might be confused into believing that the opinion's findings are somehow binding in the case at bar." Johnson v. Colt Indus. Operating Corp., 797 F.2d 1530, 1534 (10th Cir.1986). Dixiepig and the instant case are not sufficiently similar to outweigh, under Fed.R.Evid.Rule 403, the danger of exaggerated importance that the jury might have placed upon the Dixiepig decision. See notes 8-10, infra, and surrounding text
 
 
 [8]
 "The secondary meaning doctrine ... holds that words that have a primary meaning of their own ... may by long use in connection with a particular product, come to be known by the public as specifically designating that product." Volkswagenwerk Aktiengesellschaft v. Rickard, 492 F.2d 474, 477 (5th Cir.1974). "In order to establish secondary meaning, the plaintiff 'must show that the primary significance of the term in the mind of the consuming public is not the product but the producer.' " Soweco, 617 F.2d at 1183 n. 16 (citing Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73, 78 (1938))
 
 
 [9]
 See note 4, supra (jury findings (2) and (4) in favor of TPS)
 
 
 [10]
 For a similar situation, see Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir.1967). There, this Court held that the passage of time had altered a decision over sixty years prior stating that "Continental" was a term inherently incapable of being appropriated as a trademark or a service mark. "Time, tide, and the relentless movement of the copywriter's pen makes what we once said no longer controlling, not so much from change in the law, but from change in economic fact." Id. at 862
 
 
 [11]
 Section 1052(e)(1) prohibits the registration of a mark that, "when applied to the goods of the applicant is merely descriptive ... of them." We point out, as we have in the past, that "the term 'descriptive', as used in this opinion, signifies trademarks that are 'merely descriptive' within the meaning of this subsection. It does not refer to generic or 'common descriptive' names." Soweco, 617 F.2d at 1183 n. 15
 
 
 [12]
 See note 8, supra, and surrounding text
 
 
 [13]
 While the swine showdown occurred in Dallas, the San Antonio jury which heard this case still represents the relevant geographical area. See Sheila's Shine Products, Inc. v. Sheila Shine, Inc., 486 F.2d 114, 124 (5th Cir.1973) (a state is an appropriate territory by which to define trade areas when two parties are competing over the right to use the same mark)
 
 
 [14]
 In order to sustain this second factor, Hard Rock must prove five elements: (1) a false representation of a material fact; (2) knowledge or belief that the representation is false; (3) intent to induce the PTO to act or refrain from acting in reliance on the misrepresentation; (4) reasonable reliance by the PTO on the misrepresentation; and (5) damage from such reliance. Artcraft Novelties v. Baxter Lane Co., 685 F.2d 988, 992 (5th Cir.1982). As we will discuss, Hard Rock's argument does not satisfy the first element, and thus we need not address elements (2) through (5)
 
 
 [15]
 See note 4, supra, no. 9. To aid its decision on this special interrogatory, the jury was instructed:
 Unjust enrichment means the unjust retention of a benefit to the loss of another or unjust retention of money or property of another which is against the fundamental principles of justice or equity and good conscience. Unjust enrichment is present if you find that Hard Rock Cafe has used the goodwill and reputation of Texas Pig Stands to sell its own goods or services.
 
 
 [16]
 The court held: "The jury's finding of unjust enrichment is not supported by the record and cannot stand."
 
 
 [17]
 See note 15, supra
 
 
 [18]
 Hard Rock presented evidence establishing that Neely's, a Dallas restaurant, had offered "pig sandwiches" from 1947 through 1975, and another Dallas restaurant, Chip's Old Fashioned Grill, has offered "Chip's Pig Sandwich" since 1985. As far as we can tell, the only difference between these restaurants and Hard Rock, all of them users of the term "pig sandwich," is the depth of their respective pockets
 
 
 [19]
 The only mention of "pig sandwich" is the simple listing of the term in Hard Rock's menu. Hard Rock made no other display of TPS' mark to the public. TPS contends that the picture of "The Sign of the Pig" that hung on the wall of Hard Rock's employee lounge constitutes such public display. However, we find this argument highly attenuated considering that the employee lounge was not open to the public and was located some distance from the public restaurant. In fact, the picture, with the caption "Pig Sandwich (1930) Houston," on the undisputed evidence was merely part of the voluminous Americana memorabilia collected and displayed by Hard Rock
 
 
 [20]
 The totality of the circumstances presented here bears an interesting similarity to the situation in Love v. New York Times Co., 691 F.2d 261, 265 (6th Cir.1982), where the court upheld the denial of all equitable relief upon a showing that defendant did not palm off its goods as those of the plaintiff. Plaintiff sought an accounting for profits rather than damages but failed to present any evidence that defendant's use of the disputed term "had contributed in any ascertainable sum to plaintiff's previously existing financial troubles."
 
 
 [21]
 Section 1117(a) provides, in part: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a)
 
 
 [22]
 See Interrogatories, note 4, supra, none of which involved any monetary findings
 
 
 [23]
 Some cases have also recognized the plaintiff's loss of profits or the suffering of economic damage as important factors. See V.I.P. Foods, 675 F.2d at 1107 ("the court also found that plaintiff had suffered no ascertainable damage or loss of profits because of defendant's use of the V.I.P. mark"); Burger King Corp. v. Metro Club, Inc., 208 U.S.P.Q. 293, 306 (E.D.Mich.1980) (an "exceptional case" almost invariably involves "a situation where the infringer is either hurting the protected mark holder financially or has it within his power by his wrongful conduct to do so"). While the lack of such damage does not prohibit a trial court from finding the case to be "exceptional," The Post Office v. Portec, Inc., 913 F.2d 802, 812 (10th Cir.1990), such a finding is an important circumstance to consider
 
 
 [24]
 The Department of Commerce, in requesting the insertion of the provision for attorney's fees in the Lanham Act, stated that the decision "whether to award treble damages, attorney fees, or both, or neither" would be within the trial court's discretion. S.Rep. No. 1400, 93rd Cong.2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 7132, 7136
 
 
 [25]
 A few cases have gone as far as to require "very egregious conduct" to constitute an "exceptional" case. See e.g., Burger King, 208 U.S.P.Q. at 306; Kayser-Roth Corp. v. Fruit of the Loom, Inc., 219 U.S.P.Q. 736, 752 (S.D.N.Y.1983) (holding that infringer's conduct must be egregious, as "[t]he intentional infringement of a trademark has been held insufficient to justify an award under the statute"). We do not attempt to draw a bright line determination for what conduct constitutes an "exceptional" case for all circumstances and situations; we hold only that the facts before us today do not reach the "exceptional" level